T.C. Memo. 2002-80

UNITED STATES TAX COURT

ESTATE OF WILLIAM G. ADAMS, JR. DECEASED, GEORGE W. SAENGER,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14698-99.                    Filed March 28, 2002.

George W. Saenger, pro se.

James E. Gray and Steven Webster, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined a $635,018.85
deficiency in the estate tax of the Estate of William G. Adams,
Jr. (decedent).  After concessions, the sole issue for decision
is whether the fair market value of decedent's 61.59-percent
interest in Waddell Sluder Adams & Co., Inc. (WSA), on September

28, 1995, was $1,746,000, as respondent determined, or $920,800, as the estate contends. We hold that it was $1,161,705.

Unless otherwise specified, section references are to the Internal Revenue Code as amended and in effect on the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. <u>Decedent and the Executor</u>

Decedent, who lived in Asheville, North Carolina, died testate on September 28, 1995. When he died, he owned 178 shares of WSA voting common stock, which was 61.59 percent of its outstanding stock. Voting common stock was WSA's only outstanding stock when decedent died.

George W. Saenger, the executor of decedent's estate, lived in Asheville, North Carolina, when the petition was filed.

B. <u>Waddell Sluder Adams & Co., Inc.</u>

1. <u>Insurance Business</u>

WSA has been an S corporation since the early 1970s. It has two components, a retail insurance agency and a managing general insurance agency (MGA). In 1995, the retail agency generated 5 percent of WSA's revenue, and the MGA generated 95 percent. The retail agency sells insurance to the public.

When decedent died, and until the time of trial, WSA had a contract with the Maryland Casualty Co. (MCC) to be an MGA. The contract provides that MCC is the sole supplier of insurance to the MGA and that WSA has the exclusive right to sell personal and commercial lines of insurance for MCC in 17 counties in western North Carolina. In 1995, 68 to 72 percent of WSA's business came from personal lines. WSA was MCC's only MGA in 1995. MCC or WSA could terminate the contract at any time by giving 180 days' written notice to the other party.

WSA sells insurance for MCC through about 42 independent retail insurance agents. Independent agents may obtain insurance for their customers from any insurance company. WSA processes insurance applications from customers of the retail agents and makes underwriting decisions. If WSA accepts an application, it sets the premium, issues the policy to the retail agent, and pays the premium to MCC. MCC then pays part of the premium to WSA. WSA uses these funds to pay its expenses and the retail agents and keeps the excess as profit. The retail agents have contracts with WSA which establish the amounts of commissions they will receive for selling MCC products. WSA would not be a viable business without its relationship with MCC or if it could not sell personal lines of insurance.

2.    Key Personnel

    a.    Decedent

Decedent began working for WSA in the mid-1940s.  He became president of WSA around 1972, and he worked for WSA until April or May 1995.  He worked fewer hours in his later years.  His primary function in those later years was to set wage and bonus levels for WSA officers.

    b.    Robert B. Gelder, Jr.

Robert B. Gelder, Jr. (Gelder), was born in 1949 and has lived in Asheville, North Carolina, since 1953.  He graduated from the University of North Carolina.  He worked for 5 years for NCNB (now Bank of America).  He began working for WSA in 1976.

Gelder spent his first year at WSA learning the insurance business.  In 1976, WSA's insurance underwriting was divided between property and casualty lines of coverage.  Gelder became the manager for personal and commercial lines of casualty insurance after 15 months at WSA.  He began to perform underwriting services, i.e., to assess risk for applicants of property insurance policies, around 1982.  He developed marketing skills and gained experience in all aspects of underwriting for WSA.  He developed and maintained a close relationship with the independent agents who sold WSA products and with MCC personnel.  He became the sole liaison between WSA and MCC beginning around 1982.  He began managing WSA around 1987.  He became the general

manager and president of WSA in 1994.  In 1995, his duties included maintaining WSA's relationship with MCC and the retail agents in western North Carolina.  He has performed all of the management functions for WSA since 1995.

Gelder has no written employment contract or noncompete agreement with WSA.  WSA had no other employee who could replace Gelder in 1995.  Gelder's compensation and dividends from WSA for 1991-95 were as follows:

|  | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|
| Wages | $234,700 | $258,100 | $299,600 | $381,200 | $381,465 |
| Dividends | 76,614 | 83,581 | 84,247 | 108,889 | 167,239 |
| Total | 311,314 | 341,681 | 383,847 | 490,089 | 548,704 |

### c.  Julia Adams Slipher

Julia Adams Slipher (Slipher) is decedent's daughter. Slipher began working for WSA in 1977 as an assistant bookkeeper. She later began underwriting personal lines of insurance, and she was responsible for underwriting property insurance coverage for commercial middle markets (not otherwise described in the record) in 1995.  Slipher could not have done Gelder's job in 1995.

### 3.  Officers and Employees

On September 28, 1995, WSA's officers were Gelder (president), Slipher (vice president and secretary), and decedent (treasurer).  On that date, WSA had 16 employees in addition to Gelder, Slipher, and decedent.

4.   Stock Holdings on September 28, 1995

On September 28, 1995, decedent, Gelder, and Slipher owned WSA's stock as follows:

| Shareholder | No. of shares | Percentage of total |
|---|---|---|
| William G. Adams, Jr. | 178 | 61.59 |
| Robert B. Gelder, Jr. | 105 | 36.33 |
| Julia Adams Slipher | 6 | 2.08 |
| Total | 289 | 100.00 |

5.   Zurich Insurance Group's Purchase of MCC

The Zurich Insurance Group (Zurich) purchased MCC in the late 1980s.  Zurich considered implementing a "service center" concept for MCC, which would have caused WSA to lose underwriting authority, eliminated the need for WSA to serve as an MGA or as a retail agency, and eliminated the work done with WSA by the independent agents throughout western North Carolina.  WSA opposed imposition of the service center concept in the 17 counties which it serviced, and Zurich eventually abandoned the concept.  Through considerable effort, Gelder maintained and improved WSA's relationship with Zurich.

6.   Pending Litigation

The North Carolina Rate Bureau represents insurance companies before the Insurance Commissioner of North Carolina. In 1994, the Rate Bureau commenced litigation with the Insurance Commissioner which potentially affected WSA.  If the Rate Bureau had prevailed, WSA would have been required to pay about $407,000

to Zurich to be refunded to WSA's customers.  That litigation was pending on September 28, 1995.

OPINION

A.   Contentions of the Parties

The estate contends that the value of decedent's 178 shares of WSA stock (a 61.59-percent interest) on September 28, 1995, was $920,800.  Respondent contends that the value was $1,746,000 on that date.[1]

A tax is imposed on the fair market value of the decedent's property on the date of death.  Secs. 2001, 2031.  The fair market value of property is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.  The estate bears the burden of proof.[2]  Rule 142(a)(1).

Both parties rely on the testimony of experts to establish the fair market value of decedent's WSA stock.  We may accept or reject expert testimony according to our own judgment, and we may

---

[1]  In objecting to the estate's proposed ultimate finding of fact, respondent contends that the fair market value was $1,757,911.  However, respondent's proposed ultimate finding of fact is that the value of decedent's interest in WSA was $1,746,000, the value that respondent determined.  Respondent does not explain this difference.

[2]  The estate concedes that sec. 7491 does not apply because the examination began before July 22, 1998.

be selective in deciding what parts of an expert's opinion, if any, we accept.  <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938).

Herbert T. Spiro (Spiro) testified for respondent.  F. Foster Shriner (Shriner) testified for the estate.[3]  Shriner and Spiro estimated, and computed the present value of, future returns an investor would receive from an investment in WSA. They did so by calculating the present value of the stream of estimated future cashflows to WSA.  Spiro concluded that the fair market value of the shares at issue was $1,904,403 on September 28, 1995; Shriner concluded that it was $920,800.

B.   <u>Spiro's and Shriner's Expert Reports</u>

We believe that Shriner's approach for estimating the value of WSA stock (before applying a discount for lack of marketability) was more thorough than Spiro's.  Spiro did not speak with anyone from MCC or investigate the pending

---

[3]  Kevin M. Stipe also testified for the estate.  However, the estate does not rely on Stipe's estimate even though it was more favorable to the estate than Shriner's estimate.  We do not consider Stipe's estimate of value.

litigation.[4]  Shriner did those things, and reasonably concluded that it was unlikely that WSA would survive without Gelder.

C.    Whether Shriner Properly Estimated Gelder's Future Compensation

Respondent contends that Shriner underestimated future net cashflows by overestimating future compensation to Gelder.  On the basis of Spiro's testimony, respondent contends that Shriner should have used $125,000 per year as Gelder's future compensation.  We disagree.

Gelder's salary in 1995 was $381,465 and his salary and dividends totaled $548,704.  Spiro acknowledged that Gelder was a key employee, and that no one would buy WSA without Gelder.  We do not believe that Gelder could have been replaced for $125,000 per year.

Respondent contends that WSA could have found a suitable replacement for Gelder in 1995 and that Gelder had no attractive employment alternative.  We disagree.  Slipher testified that it was unlikely that anyone could assume Gelder's responsibilities because few people understood as well as did Gelder the market, the industry, underwriting, and management as they affect WSA.

---

[4]  In his report, Spiro said:

Not having interviewed persons in authority at The Maryland in 1995, it is impossible to determine conclusively whether or not The Maryland would have cancelled or materially modified WSA's personal lines underwriting authority upon the transfer of Mr. Adams' interest to another party.

Spiro projected Gelder's future salary based on the salary of the top 10 percent of underwriters, even though Gelder spent only 10 or 15 percent of his time underwriting. Spiro's methodology ignores the fact that Gelder did much more than underwriting.

Shriner used insurance industry data for officers and managers to estimate Gelder's future compensation. That data shows that officers of companies in the insurance industry with assets of $1 million received compensation of 14.6 percent of gross revenues. Shriner estimated that future compensation of WSA officers would be 14.7 percent of WSA's gross revenues. We believe that Shriner reasonably estimated Gelder's future compensation.

Respondent contends that Shriner should have assumed that WSA would make payouts to investors at the middle of the year (midyear convention) rather than at the end of the year (yearend convention). Respondent contends that Shriner's approach is incorrect because he "artificially treats net cashflows as not received until the end of each year." We disagree. There is support for use of the yearend convention on the grounds that payment at the end of the year is better than payment in the middle of the year because payment at the end of the year enables the managers to see how the year has turned out. Pratt, Cost of Capital, Estimations and Applications 30-31 (1998). We do not

apply the midyear convention here because respondent offered no evidence that WSA would pay its investors at the middle of the year rather than at the end of the year.

D.    Estimating the Discount and Capitalization Rates

Shriner used the income capitalization method and Spiro used the discounted cashflow method to estimate the fair market value of WSA stock.  In the discounted cashflow method, a discount rate is applied to a series of future cashflow periods (e.g., each year in the future that the asset will produce a return on investment) to estimate present value.  In the income capitalization method, the future cashflow of a single period (e.g., the next year) is estimated.  An estimated growth rate is applied to project the cashflow for that single period into the future.  An estimated discount rate is applied to reduce the projected future cashflows to present value.  A capitalization rate combines the estimated growth rate and the discount rate. It is applied to the estimated future cashflow of the single period.  Neither party contends that the other's method is inappropriate here.

Both experts began their analyses by estimating a discount rate to apply to WSA's projected net cashflow using the "build-up method".  They both used a rate of return on risk-free investments (risk-free rate) of 6.86 percent, which was the 30-year Treasury rate for August 1995.

1.   Added Risk Premiums

Both experts increased the 6.86-percent rate to account for risks that an investor in WSA would assume; i.e., "added risk premiums".

Spiro and Shriner both added a 7.03-percent equity risk premium[5] to account for the fact that the rate of return on stock is less certain than on U.S. Treasury obligations.  They obtained this value, which is based on investment returns of C corporations, from Stocks, Bonds, Bills, and Inflation: 1995 Yearbook by Ibbotson Associates, Inc.

Both experts added a 5.25-percent risk premium to account for the fact that WSA was a small company.  Both experts based this added risk premium on data from Ibbotson Associates.

Spiro also added a 10-percent risk premium to account for potential loss of personal lines of underwriting authority and the fact that WSA is an S corporation.  Shriner added a 9.03-percent risk premium (7.03 percent for WSA's tenuous relationship with Zurich and 2 percent for its thin management and the importance of Gelder).  The sum of the risk-free rate and added risk premiums equaled a discount rate of 29.14 percent for Spiro and 28.17 percent for Shriner.

---

[5]  Adding the equity risk premium to the risk-free rate is a widely accepted method.  Brealey & Myers, Principles of Corporate Finance 146-147 (5th ed. 1996); Pratt, Cost of Capital, Estimation and Applications 62 (1998).

2.   Deriving a Capitalization Rate

Shriner derived a capitalization rate of 20.53 percent from his estimated discount rate and from his estimated future average annual growth rate of 6.34 percent for WSA.[6]  Respondent does not dispute Shriner's estimated growth rate or capitalization rate. We accept Shriner's estimate of a capitalization rate of 20.53 percent.  However, we do not accept an increase that Shriner made to that rate for reasons discussed next.

3.   Whether Shriner Properly Converted the Capitalization Rate From an After Corporate Tax Rate to a Before Corporate Tax Rate

The net cashflow and the capitalization rate used to compute the fair market value of the WSA stock should have the same tax character; i.e., before corporate tax or after corporate tax. See Gross v. Commissioner, T.C. Memo. 1999-254 (both the discount rate and cashflow should be before shareholder tax or after shareholder tax), affd. 272 F.3d 333 (6th Cir. 2001).  See generally Black & Issom Associates, Fundamentals, Techniques and Theory of Capitalization/Discount Rates, ch. 5, at 23 (1995); Ibbotson Associates, Stocks, Bonds, Bills and Inflation: Valuation Edition 1999 Yearbook; Pratt, supra at 151-152, 155.

---

[6]  The capitalization rate is generally derived by reducing the discount rate by the expected long-term stable growth rate of net cashflows to the investment being valued.  Pratt, supra at 21-23.

The estate contends that Shriner's estimates of WSA's prospective net cashflows are before corporate tax. The estate also contends that Shriner properly converted the capitalization rate from an after corporate tax rate to a before corporate tax rate to match estimated prospective net cashflows and that the conversion increased his capitalization rate from 20.53 percent to 31.88 percent. We disagree with the estate on both points.

We disagree that Shriner's estimates of WSA's prospective net cashflows are before corporate tax because it is appropriate to use a zero corporate tax rate to estimate net cashflow when the stock being valued is stock of an S corporation. Gross v. Commissioner, supra. WSA is an S corporation, and its cashflows are subject to a zero corporate tax rate. Thus, Shriner's estimates of WSA's prospective net cashflows are after corporate tax (zero corporate tax rate) and not before corporate tax as the estate contends.

We disagree that Shriner properly converted the capitalization rate because there was no need to do so. The parties agree that Shriner's estimated capitalization rate (before he converted it to before corporate tax) is an after corporate tax rate. Thus, as in Gross, the tax character of Shriner's estimate of WSA's prospective net cashflows matches that of the unconverted capitalization rate because both are after corporate tax. It follows that Shriner should not have

converted the capitalization rate from after corporate tax to before corporate tax because the tax character of both his estimated net cashflows for WSA and unconverted capitalization rates is after corporate tax.

We conclude that Shriner improperly increased the capitalization rate from 20.53 percent to 31.88 percent.[7]

4.   Conclusion

The following shows the value of decedent's interest in WSA on September 28, 1995, before applying a discount for lack of marketability:

| | |
|---|---|
| Normalized net cashflows | $595,746 |
| Capitalization rate | ÷ 20.53% |
| Capitalized net cashflows - total entity | [1]$2,901,831 |
| Equity interest of 61.59 percent | x .6159 |
| Value of decedent's interest | [2]$1,787,238 |

[1]   $595,746/.2053 = $2,901,831.
[2]   Before discount for lack of marketability.

E.   Discount for Lack of Marketability

Both experts applied a discount for lack of marketability because there was no ready market for WSA stock on September 28, 1995.  We agree that a discount for lack of marketability is appropriate.

---

[7]  The result here of a zero corporate tax on estimated prospective cashflows and no conversion of the capitalization rate from after corporate tax to before corporate tax is identical to the result in Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001), of zero corporate tax rate on estimated cashflows and a discount rate with no conversion from after corporate tax to before corporate tax.

Shriner applied a 20-percent discount for marketability. To calculate the marketability discount, he first derived a 32.89-percent discount by averaging the discounts found in various restricted stock studies. He reduced that amount to 20 percent to account for his belief that the insurance industry was more stable than the general market.

Like Shriner, Spiro found that the average marketability discount based on restricted stock studies was between 30 and 35 percent. Spiro also found that initial public offering studies show an average marketability discount of nearly 45 percent. Spiro considered the fact that WSA's very specialized operations would limit potential buyers and detract from the stock's marketability. He also considered the size of the block of stock and elements of control which could enhance marketability. After listening to testimony at trial, he stated that a discount for lack of marketability of 40 or 45 percent would be appropriate to account for the risk due to the pending Rate Bureau litigation. We conclude that a 35-percent discount for lack of marketability applies.

We disagree with Shriner's reduction from about 33 percent to 20 percent because we do not believe WSA was as stable as the insurance industry average. We disagree with Spiro's increase from 35 percent to 45 percent, not because the Rate Bureau litigation should not be considered, but because we believe a 35-

percent discount adequately takes into account WSA's vulnerabilities.

F.    Conclusion

The fair market value of decedent's interest in WSA on September 28, 1995, is $1,161,705 ($1,787,238 x .65).

Because of concessions and the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.