T.C. Memo. 2004-123


UNITED STATES TAX COURT


ESTATE OF MICHEL DUNIA, DECEASED, RENEE HAWLEY AND MICHEL DUNIA,
JR., EXECUTORS AND TRUSTEES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6115-00.                    Filed May 20, 2004.


<u>Paul N. Frimmer</u> and <u>Martin Gelfand</u>, for petitioner.

<u>Jack Klinghoffer</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GOEKE, <u>Judge</u>:  Respondent determined a deficiency of
$8,675,853 in the Federal estate tax of the estate of decedent
Michel Dunia.  After concessions, the issue for decision is the
value of a tract of real property held for sale as a commercial
site.  Both parties presented experts who valued the property
using comparable sales.  Respondent also relies on alleged offers

for the property, a partnership agreement, and a partial sale which took place 3 years after the valuation date. Because the offers were not completed commercial transactions and are flawed as comparables, we rely primarily on a comparable analysis to determine that the fair market value of the property at the valuation date was $5,463,666.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of his death, Michel Dunia (decedent) was domiciled in Los Angeles, California. The executors resided in Los Angeles, California, at the time the petition was filed.

Decedent died on June 22, 1996. On the date of death, decedent owned 100 percent of the Michel Dunia Trust (the trust). The trust owned the property at issue (the Victorville property), which is legally described as 92.91 net acres (4,047,160 square feet) of undeveloped land located at the Southwest Quadrant of Bear Valley Road and Amargosa Road, Victorville, San Bernardino County, California. After his death, decedent's children, Renee Dunia Hawley and Michel Dunia, Jr., were appointed the executors of the estate and co-trustees of the trust (Ms. Hawley and Mr. Dunia are sometimes hereinafter referred to as the trustees).

From 1990 to 1996, the value of commercial real property similar to the Victorville property declined as a result of economic market conditions in Victorville. The values bottomed out in 1996, and remained stable between 1996 and 2000. In January 1996, decedent gave a 6-month exclusive real estate listing authorization for the Victorville property to Vicki Donkin of Grubb & Ellis Commercial Services, who marketed the property with an asking price of $5 per square foot, at decedent's request.

In September 1996, after decedent died, Ms. Hawley terminated the listing agreement that decedent had entered into with Ms. Donkin. On September 21, 1996, the trustees signed a 1-year exclusive listing authorization with Richard Hallett, a real estate broker, with respect to the Victorville property.

In October 1996, Landfolio, Inc. (Landfolio), submitted a letter of intent (LOI) to Ms. Donkin to buy the Victorville property for $5,320,000, payable partly in cash and partly as a subordinated note. Under the terms of the LOI, the buyer would deposit $5,000 into a 150-day escrow. The deposit was fully refundable if the contingencies were not met after 90 days. On October 17, 1996, Mr. Hallett, via Ms. Donkin, sent a counteroffer to Landfolio, offering to sell the Victorville property for $3 per square foot. Around February 1997, Landfolio made another proposal to purchase the Victorville property for $6

million.  This offer included an initial escrow deposit of $25,000, another $25,000 deposit after 120 days, and the balance of the purchase price to be paid in cash 150 days after the opening of the escrow.

Landfolio's LOI was communicated to Ms. Hawley, but the parties dispute whether Mr. Hallett communicated the second proposal to Ms. Hawley.

On March 7, 1997, GVD, Inc., a commercial real estate development company owned by Gerald Dicker, entered into a purchase agreement with the trustees to purchase the Victorville property for $8.4 million.  The purchase agreement provided for a 36-month escrow, with an initial deposit of $25,000, increased by $12,500 every 6 months for 2 years.  The closing of the transaction was subject to various contingencies, which allowed GVD, Inc., to cancel the agreement at any point during the 36-month escrow period.  In December 1997, 10 months after opening the escrow, GVD, Inc., canceled the sale pursuant to the terms of the contract.

On May 4, 1998, the trustees signed a partnership agreement for Bear Valley Partners with Western Signature Properties, Inc., a company of which Mr. Dicker was president (referred to hereinafter as WSP).  WSP was the general partner, with the trustees (in their capacity as trustees of the trust) as the sole limited partner.  The partnership was formed to serve as a joint

venture to develop the Victorville property.  Under the partnership agreement, WSP, as general partner, would receive 25 percent of the profits, losses, and distributions from the partnership, and the trustees, as limited partner, would receive 75 percent of the profits, losses, and distributions from the partnership.  Ownership of the Victorville property remained in the trust, and the partnership agreement stated that portions of the Victorville property would be transferred to Bear Valley Partners as buyers were found.

On July 1, 1999, Bear Valley Partners sold 15.87 acres (691,297 square feet) of the Victorville property to Lowe's H I W, Inc. (Lowe's), for approximately $4.1 million.  The sale was subject to a holdback of a portion of the purchase price and a reimbursement arrangement concerning improvements to be made by Bear Valley Partners to the Victorville property.

On March 21, 1997, the estate filed a Federal estate tax return.  The estate elected the date of death (June 22, 1996) as the valuation date.  On the return, the estate reported the value of the Victorville property as $4.05 million.  On March 8, 2000, respondent issued a statutory notice of deficiency to the estate, determining a deficiency of $8,675,853.  Respondent's determination of the deficiency resulted from a valuation of the property at $16.3 million.  The estate timely petitioned this Court for review of respondent's determination.

OPINION

Section 2001[1] imposes a Federal estate tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States".  The value of the gross estate includes the value of all property to the extent of the decedent's interest therein on the date of death.  Sec. 2033. The term "value" means fair market value, which is defined for Federal estate tax purposes as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

The parties dispute the value of the Victorville property, which is includable in decedent's gross estate.  At trial, the estate called B.G. Thompson as an expert valuation witness.  Mr. Thompson prepared an expert witness report, as supplemented, in accordance with Rule 143.  Respondent called Robert Perdue as an expert valuation witness.  Mr. Perdue prepared an expert witness report, as supplemented, in accordance with Rule 143.  In addition, the estate sought testimony from Mr. Dicker as to his opinion of the value of the Victorville property.  While expert

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

opinions may assist in evaluating a claim, we are not bound by these opinions and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Where experts offer conflicting estimates of fair market value, we must weigh each estimate by analyzing the factors they used to arrive at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). We may accept the opinion of an expert in its entirety, or we may be selective in the use of any portion. Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). Mr. Perdue's report concluded that the value of the Victorville property was $8.5 million ($2.10 per square foot) on the valuation date. Mr. Thompson's report concluded that the value of the Victorville property was $4.45 million ($1.10 per square foot) on the valuation date.

The Court of Appeals for the Ninth Circuit has held that the burden of persuasion may be shifted from the taxpayer to the Commissioner when the Commissioner's determination is shown to be invalid by his own expert. See, e.g., Estate of Mitchell v. Commissioner, 250 F.3d 696, 702 (9th Cir. 2001), affg. in part, vacating in part and remanding T.C. Memo. 1997-461. At trial, respondent's expert placed a value of $8.5 million on the

Victorville property, slightly more than half of the $16.3 million valuation stated in the statutory notice of deficiency. The estate did not raise the issue of the shifting of the burden at trial or on brief. However, it is unnecessary for us to consider the issue. Our decision rests on the preponderance of the evidence, and is unaffected by the burden of proof.

I.   Admissibility of Mr. Dicker's Testimony as to Value

At trial, the estate sought to have Mr. Dicker testify as to his opinion of the value of the Victorville property on the valuation date. Respondent objected to the admissibility of this testimony because Mr. Dicker had not submitted an expert report, and so was not qualified as an expert under Rule 143(f). The estate argues that Mr. Dicker, as general partner of Bear Valley Partners, is an owner of the Victorville property, and is qualified to testify as an expert as to value under rule 702 of the Federal Rules of Evidence.[2]

---

[2]Fed. R. Evid. 702 provides:

Rule 702.   Testimony By Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand  the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

An owner of property is generally qualified to testify as an expert as to the property's value under rule 702 of the Federal Rules of Evidence. LaCombe v. A-T-O, Inc., 679 F.2d 431, 433 (5th Cir. 1982); Marcus v. Commissioner, T.C. Memo. 1996-190. Opinion testimony of a landowner is admissible without further qualification because of the presumption of special knowledge that arises out of ownership of the land. LaCombe v. A-T-O, Inc., supra at 433.

Bear Valley Partners did not own any part of the Victorville property until a portion of the property was contributed to the partnership in 1999 for the purpose of selling it to Lowe's. It is implied in the principle that allows owners to testify as valuation experts that the owner must own the subject property on the valuation date. Bear Valley Partners did not exist on the valuation date. Therefore, Mr. Dicker was not an owner of the Victorville property at that time by virtue of his being general partner of Bear Valley Partners, as the estate claims. In addition, the estate has not shown that he was an owner of the Victorville property by any other means on the valuation date. Since Mr. Dicker did not prepare an expert report, he does not otherwise qualify as an expert witness under Rule 143(f). We conclude that Mr. Dicker's opinion testimony as to the value of the property is not admissible under rule 702 of the Federal Rules of Evidence. See, e.g., Estate of Gloeckner v.

<u>Commissioner</u>, T.C. Memo. 1996-148 (indicating that ownership percentage on valuation date is significant in considering testimony of owner under rule 702 of the Federal Rules of Evidence), revd. on other grounds 152 F.3d 208 (2d Cir. 1998).

The estate also argues that rule 701 of the Federal Rules of Evidence[3] permits Mr. Dicker's testimony as to value as a lay witness. Under rule 701 of the Federal Rules of Evidence, opinion testimony by a lay witness who is not testifying as an expert is "limited to those opinions or inferences which are * * * (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702". Mr. Dicker's testimony as to value is not helpful to the Court unless it is based upon the specialized knowledge derived from his experience as a real estate developer. When an opinion relies on specialized knowledge, the basis of that opinion must be presented to the other party in an expert report under this Court's Rule 143(f)(2). Allowing Mr. Dicker's testimony as to value under

_____

[3]Fed. R. Evid. 701 provides:

Rule 701. Opinion Testimony by Lay Witnesses

    If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

rule 701 of the Federal Rules of Evidence would be inconsistent with the spirit of our Rules and the Federal Rules of Evidence. In addition, Mr. Dicker's testimony, even if deemed admissible, would not persuade us to arrive at a different valuation since it is not based on comparable transactions. We hold that Mr. Dicker's testimony as to the value of the Victorville property is inadmissible.

## II. Valuation

Both parties' experts analyzed similar properties that were recently sold in the proximate timeframe. The characteristics of the properties were then compared to the Victorville property, and adjustments in value were made to the comparable properties, as appropriate. The experts in this case compared market conditions, location, size, topography, access, frontage, offsite improvements, and zoning.

Mr. Thompson selected the February 1996 sale of a 106.74-acre parcel of primarily undeveloped land for $1.42 per square foot (the Jess Ranch sale) as the most relevant comparable. After adjustments, Mr. Thompson concluded that the Jess Ranch sale indicated a value of $1.14 per square foot for the Victorville property. He based his final valuation primarily on this comparable analysis. Although he also considered the various contingent offers that were made by Landfolio, and the canceled sale contract between Mr. Dicker and the trustees, he

did not consider these offers as comparables. Mr. Thompson stated that the most important factor in valuing the Victorville property was its size; in this regard, his report stated that on the valuation date, "far less than the entire 92.91 acres had a reasonable expectation of near term development potential." Mr. Thompson's final opinion was that the value of the Victorville property on the valuation date was $4.45 million, or $1.10 per square foot.

Mr. Perdue selected the October 1996 sale of 31.82 acres of undeveloped land for $996,435 ($.719 per square foot) plus the assumption of bonds[4] as the most relevant comparable. His report also considered the Jess Ranch sale, and concluded that, as adjusted, it indicated a value of $2.10 per square foot for the Victorville property. In addition to sales of similar properties, Mr. Perdue considered as comparables the contingent offers from Landfolio and the canceled purchase agreement between Mr. Dicker and the trustees. Lastly, his analysis took into account the 1996 listing price for the Victorville property under the listing agreement between the decedent and Ms. Donkin, the terms of the Bear Valley Partners' partnership agreement, and the San Bernardino County Assessor's office's 1999/2000 assessed

---

[4]The bonds resulted from an assessment to which the property was subject, payable over 27 years. The buyer's pro rata portion of such bonds was $1,325,498, resulting in a total purchase price of $2,321,933 ($1.68 per square foot), according to Mr. Perdue's expert report, as supplemented.

value of the developed portion of the Victorville property. Considering each of these factors, Mr. Perdue concluded that the Victorville property's value at the valuation date was $8,500,000, or $2.10 per square foot.

After taking into account each expert's analysis, we believe that because of the large size of the Victorville property, the Jess Ranch sale is the most relevant comparable transaction. No other comparable property in either expert's analysis was as large as the Victorville property. We believe the July 1999 actual sale of a portion of the Victorville property to Lowe's should be given limited weight because it was a partial sale 3 years after the valuation date. The alleged offers from Landfolio for the Victorville property do not represent completed transactions. The parties disagree about many details concerning the validity and presentation of these offers, but it is most significant that the potential buyer was not financially committed to the transaction due to the escrow agreements. Likewise, the purchase agreement between Mr. Dicker and the trustees did not result in a sale. We do not find the terms of this contract to be indicative of value, because the amount and term of the escrow allowed Mr. Dicker to abandon the transaction with little economic effect. The existence of the partnership between WSP and the trustees also fails to provide an indication of value. Consequently, we must now examine each factor the

experts took into account in comparing the Victorville property to the Jess Ranch property.

The table below describes each expert witness's adjustments to the Jess Ranch sale, as supplemented at trial.

| Factor | Mr. Thompson | Mr. Perdue |
|---|---|---|
| Market conditions | 0 | -3% |
| Adjusted unit price | $1.42 | $1.37 |
| Location/exposure | 20% | 30% |
| Size | 0 | 0 |
| Topography | 5% | |
| Access | -10% | 20% |
| Frontage | 0 | |
| Offsite improvements | -35% | -2% |
| **Total adjustment** | **-20%** | **50%** |
| Adjusted unit price | $1.14 | $2.10 |

A.  Market Conditions

The parties stipulated that the market for properties such as the Victorville property and the Jess Ranch property declined from 1990 until 1996, and that values bottomed out in 1996.  Mr. Perdue adjusted comparable sales made prior to the valuation date, including the Jess Ranch sale, downward to reflect the decreased market conditions in 1996.  Mr. Thompson adjusted each comparable sale that was made prior to January 1995 downward to reflect this market decline.  The parties did not show that there was a decline in market conditions between February 1996, the date of the Jess Ranch sale, and June 1996, the valuation date.  In addition, the record does not show a specific point during 1996 at which values bottomed out.  We decline to make any adjustment to the Jess Ranch sale price for market conditions given the proximity of the Jess Ranch sale to the valuation date.

B.  Location/Exposure

The Victorville property is adjacent to Interstate 15, a major north-south freeway, and Bear Valley Road, a major east-west road.  The Jess Ranch property is located about 5 miles west of Interstate 15, also on Bear Valley Road.  Mr. Thompson applied a positive 20-percent adjustment to the Jess Ranch sale price, and Mr. Perdue applied a positive 30-percent adjustment, to reflect Jess Ranch's distance from the freeway relative to the Victorville property.  Mr. Perdue attributed his 30-percent

adjustment to the fact that the Jess Ranch property, being 5 miles from the freeway, would attract local, rather than regional, customers. He also stated that the Victorville property was across the street from the region's only regional shopping center. The determination of the amount of this adjustment is necessarily subjective, but we find that a 20-percent adjustment sufficiently takes into account the Jess Ranch property's distance from the freeway, and the disadvantages that accompany that location. Therefore, we apply a 20-percent positive adjustment to the Jess Ranch sale price for location/exposure.

C. Size

Neither expert made any adjustment for the size of the two properties. The Victorville property is 92.91 acres, and Jess Ranch was 106.74 acres. No other comparables examined by either expert (except the alleged offers on the Victorville property, which we do not consider as comparables) are nearly as large as the Jess Ranch property. We conclude that no adjustment is necessary for size.

D. Topography

Both experts reported that the Jess Ranch property had a 5-acre flood retention basin, which caused awkward building siting and poor functional utility on the affected 5 acres. As a result, Mr. Thompson positively adjusted the Jess Ranch sale

price by 5 percent because he concluded that the 5 acres represented almost 5 percent of the Jess Ranch property. Mr. Perdue combined topography with access and frontage and made an aggregate positive 20-percent adjustment for those three factors. He did not explain how he would have divided the 20-percent adjustment, and we decline to speculate on his analysis. We therefore accept Mr. Thompson's 5-percent positive adjustment for topography.

E. <u>Access</u>

Mr. Thompson made a negative adjustment of 10 percent for access because he stated that the Jess Ranch property was surrounded on four sides by streets, while the Victorville property has streets on only two sides. Mr. Perdue made a positive 20-percent adjustment for topography, access, and frontage. He stated that the Jess Ranch property was inferior to the Victorville property in access, because it was 5 miles from the freeway. In addition, he stated that two of the streets surrounding the Jess Ranch property were minor, residential streets.

We believe that Mr. Perdue's positive adjustment for access because of the Victorville property's proximity to the freeway was appropriately factored into our 20-percent positive adjustment for location, and to make another adjustment here would be double-counting. We disagree with Mr. Thompson that the

additional streets serving the Jess Ranch property add more value. However, the estate has demonstrated that the shape and lack of street access on two sides of the Victorville property decreases accessibility to some parts of the acreage, and will limit development on those parts. Therefore, we adjust Mr. Thompson's negative 10-percent adjustment for access to negative 5 percent.

F. <u>Frontage</u>

Both experts agreed in their reports that the Jess Ranch property and the Victorville property had similar frontage. Mr. Thompson did not make an adjustment for frontage. Mr. Perdue, as we explained above, made a positive 20-percent adjustment for topography, access, and frontage combined but stated in his report that the Jess Ranch property and the Victorville property had similar frontage. We make no adjustment for frontage.

G. <u>Offsite Improvements</u>

Both experts agreed that the Victorville property needed extensive offsite improvements in order to be developed. These included the widening of exterior and interior streets, the relocation of overhead electrical lines to underground, and the installation of water lines, sewer lines, telephone lines, and traffic signals. The Jess Ranch property, according to Mr. Thompson, had underground water, sewer, and electrical on its entire frontage, which was approximately the same size as the

Victorville property frontage, at the time of its sale. He stated that it had also received "widening [of] interior streets, signals, walks, curbs, gutters, etc.," prior to its sale. He applied a downward adjustment of 35 percent to the Jess Ranch sale price.[5]

Mr. Perdue stated that the Jess Ranch property was left as raw land at its sale date, and needed the same improvements that the Victorville property needed. However, he admitted that the Jess Ranch property did have some curbs, gutters, sidewalks, and a traffic signal, and some of the road was done. He made a negative adjustment of 2 percent for offsite improvements.

Neither expert provided a clear explanation of the amounts of their final adjustments for offsite improvements. Mr. Thompson explained that he believed that the Jess Ranch property required 25 percent less improvement than the Victorville property. Mr. Perdue claimed that he based his adjustment on a conversation he had with the seller of the Jess Ranch property. From this conversation, he speculated that the only improvements that had been made were to service a Target store that was adjacent to, but not actually a part of, the Jess Ranch property. The Jess Ranch development plan allocated 27.34 acres, or 25.6

---

[5]Mr. Thompson split utilities out from offsite improvements. He made a negative 25-percent adjustment for offsite improvements, and a negative 10-percent adjustment for utilities. Because we believe the term "offsite improvements" sufficiently encompasses utilities, we do not separate the two.

percent of the site, for support of the Target store. Because we believe that the improvements made to the Jess Ranch property significantly added to its value, but also left much of the site to be improved, we apply a negative adjustment of 25 percent to the Jess Ranch sale price.

H. <u>Zoning</u>

Mr. Perdue testified that 39 acres of the Jess Ranch property were intended to be used as residential property at the time of its sale, but are now planned for use as a multiscreen cineplex. He made a 5-percent upward adjustment for the residential use. Mr. Thompson disputes Mr. Perdue's conclusion, and states that the Jess Ranch development plan indicates that the 39 acres in question were zoned neighborhood commercial. We do not think "intended residential use" warrants a 5-percent adjustment; Mr. Perdue did not show that zoning restrictions limited the 39 acres to residential use. Therefore, we make no adjustment for zoning.

In summary, we conclude that the net total adjustment to the Jess Ranch sale price, based on our comparison of the Jess Ranch sale to the Victorville property, should be negative 5 percent. The adjustment results in a unit price of $1.35 per square foot, or $5,463,666.

I.  <u>The Lowe's Sale</u>

On July 1, 1999, Bear Valley Partners sold 15.87 acres of the Victorville property to Lowe's for a stated purchase price of $4.1 million. The sale agreement provided that Bear Valley Partners would be obligated to reimburse Lowe's for up to $600,000 of development costs. Mr. Dicker testified that approximately $1.5 to $2 million was spent by Bear Valley Partners to improve the Victorville property as part of the sale to Lowe's. This was spent to build a storm drain, widen an exterior road, and install traffic signals. Most of these improvements benefited the entire Victorville property, not just the portion sold to Lowe's. On the basis of these figures, we can estimate that Bear Valley Partners received, net of development costs, approximately $2.7 million for the Lowe's property. Under the partnership agreement, the trustees presumably received only 75 percent of this amount, or approximately $2,025,000, for the most marketable tract in the 92.91 acres of the Victorville property. We give this transaction limited weight, because it occurred 3 years after the valuation date. We conclude that it is consistent with our conclusion that the Victorville property as a whole was worth no more than $5,463,666 on the valuation date.

III.  Conclusion

Because we find that the Jess Ranch sale provides a relevant comparable to the Victorville property, we have focused primarily on the characteristics of the sale of that parcel of land for our analysis.  Based on this comparable sale, we conclude that the value of the Victorville property on the valuation date was $5,463,666, or $1.35 per square foot.

To reflect the foregoing and concessions of the parties,

Decision will be entered
under Rule 155.