T.C. Memo. 2014-159

UNITED STATES TAX COURT

LEROY S. SCHMIDT AND CONNIE M. SCHMIDT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1743-12.                     Filed August 6, 2014.

<u>Larry D. Harvey</u> and <u>Julia R. Prendergast</u>, for petitioners.

<u>Nancy C. Carver</u>, <u>Miles B. Fuller</u>, and <u>Matthew K. Henderson</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies in petitioners'

Federal income tax of $113,893, $93,581, $144,727, and $149,030 for 2003, 2004,

2005, and 2006, respectively.  In the answer respondent asserted that petitioners

**[\*2]** are liable for accuracy-related penalties under section 6662(a) and (b)(2) and (3)[1] of $22,779, $18,716, $28,945, and $29,806 for 2003, 2004, 2005, and 2006, respectively. After concessions,[2] the issues for decision are: (1) whether petitioners overstated the value of Leroy S. Schmidt's conservation easement donation; and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(2) and (3) for substantially misstating the value of Mr. Schmidt's conservation easement donation or for substantially understating their Federal income tax liabilities for 2003, 2004, 2005, and 2006, respectively.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts are incorporated herein by this reference. Petitioners resided in Colorado when they petitioned this Court.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

[2]Petitioners concede that the period of limitations on assessment for 2003-06 had not expired before respondent issued the notice of deficiency. Respondent concedes that Mr. Schmidt's conservation easement donation met the requirements of sec. 170 and that the easement was worth at least $480,000.

**[*3]** I.    Mr. Schmidt's Business Background

Mr. Schmidt graduated from the University of Oregon in 1971. Mr. Schmidt gained experience in restaurant management, and in 1987 he became a McDonald's restaurant franchisee. By June 2000 Mr. Schmidt owned two McDonald's franchises and was in the process of buying a third.

Mr. Schmidt also entertained the notion of becoming a builder, and while still living in Oregon, he built eight homes in partnership with other builders. However, he never developed a subdivision from raw land.

II.    The Subject Property

On May 5, 2000, Mr. Schmidt purchased an approximately 40-acre parcel of vacant land in northern El Paso County, Colorado, for $525,000 (subject property) with the intention of subdividing and developing it. The subject property is in northern El Paso County, west of Interstate 25 and the Town of Monument, Colorado, and south of the Town of Palmer Lake, Colorado. As of May 5, 2000, the subject property was raw land with no development entitlements.

The subject property is near Pike National Forest,[3] and it is at the base of Raspberry Mountain. It is relatively flat, and it has views of rock outcroppings

[3]The subject property is separated from Pike National Forest by another parcel. However, an easement on that parcel provides direct access to Pike National Forest.

**[*4]** and mountains. Several locations on the subject property have excellent views of the Monument area.

III.    Proposed Raspberry Ridge Subdivision

On June 7, 2000, Mr. Schmidt retained the services of David F. Jones and Land Resource Associates (LRA) to provide land planning and consulting services with respect to the development of the subject property. Mr. Jones informed Mr. Schmidt of the possibility of developing the subject property in conjunction with a 68.8-acre adjoining parcel (adjacent property) along the southern edge of the subject property.[4] Both the subject property and the adjacent property were under the jurisdiction of El Paso County and zoned RR-3. Under El Paso County's Land Development Code (Development Code) as in effect at that time, RR-3 zoning permitted a density of one lot per five acres. The subject property and the adjacent property were also subject to the 2000 Tri-Lakes Comprehensive Plan.

When Mr. Jones informed Mr. Schmidt of the possibility of developing the subject property in conjunction with the adjacent property, King's Deer Development, LLC (King's Deer Development), was in the process of purchasing the adjacent property from Red Rock Ranch, Inc. (Red Rock Ranch), and intended to develop it. On a date that is unclear from the record Mr. Schmidt agreed to

---

[4]The adjacent property is also referred to as the Nevins parcel.

[*5] pursue the development of the subject property along with the adjacent property as a 108.8-acre residential subdivision with King's Deer Development (Raspberry Ridge subdivision).

Mr. Jones began the entitlement process for both landowners. He obtained a preliminary ground water investigation report from Wm. Curtis Wells & Co., and he hired other professionals to prepare reports for the entitlement applications. On December 12, 2000, Mr. Jones met with El Paso County's planning department for a preapplication meeting regarding the proposed Raspberry Ridge subdivision and filed a preapplication form.

On February 27, 2001, LRA submitted an application for underground water rights and plan for augmentation to the State of Colorado Water Court (Colorado Water Court). The Colorado Water Court approved the application on February 20, 2002.

On March 23, 2001, Mr. Jones sent to the landowners of properties adjoining the proposed Raspberry Ridge subdivision a "Notification to Adjoining Land Owner", notifying them of the proposed project. On March 26, 2001, LRA submitted to El Paso County a petition for rezoning of the subject property and the

[*6] adjacent property and a preliminary plan application with respect to the Raspberry Ridge subdivision.[5]

On April 16, 2001, Elizabeth Hacker of the El Paso County planning department sent an email to Mike Hrebenar of the El Paso County planning department providing initial feedback with respect to the Raspberry Ridge subdivision. In the email Ms. Hacker stated that "[t]he proposed 2.5 acre subdivision is consistent with the type of subdivisions in" the area.

During the fall of 2001 El Paso County Development Services and the State geologist identified seven lots within the proposed Raspberry Ridge subdivision that required further study because of various topographical and geological issues. Only one of the seven lots was within the subject property, and LRA prepared further studies to illustrate the potential development of that site.

By a fax dated November 2, 2001, Mr. Jones sent to Mr. Schmidt a cost estimate for the proposed Raspberry Ridge subdivision. In the cover letter Mr. Jones wrote:

> Attached are the preliminary development cost estimates for your portion of the Raspberry Ridge subdivision. Where costs are shared of the King's Deer group, I have assigned 40% to you and 60% to King's Deer based upon each owner[']s lot numbers. Other

---

[5]The petition and application requested that the property be rezoned to permit a density of one lot per each 2-1/2 acres.

[*7] costs such as roads, drainage and utilities are based upon construction units associated with the development of your specific 40 acres.  In addition, I have included one half of the costs involved in extending Red Rock Ranch Road through the Nevins' parcel to your parcel.

To look at profit potentials, I have utilized a $250,000 average lot sales price.  Given the current market, this may or may not be a realistic number and will probably depend more upon how quickly you want to sell your lots.

In the attached cost estimate Mr. Jones estimated development costs of $42,437 per lot.

At some point during 2002 King's Deer Development canceled its purchase contract with Red Rock Ranch and abandoned the proposed Raspberry Ridge subdivision.  Mr. Schmidt subsequently considered developing the Raspberry Ridge subdivision with a different codeveloper.  One of the potential codevelopers offered to reimburse Mr. Schmidt for his acquisition costs and to give to him a lot of his choice in the finished project.  Mr. Schmidt chose not to develop the Raspberry Ridge subdivision with any codeveloper.

IV.     Purchase Agreement To Acquire the Adjacent Property

On April 30, 2003, after an inquiry by Mr. Schmidt, LRA mailed a letter to him regarding the likelihood of obtaining El Paso County's approval of the development applications.  In the letter LRA explained that the El Paso County

[*8] Planning Department concluded in its review of the Raspberry Ridge subdivision that the zoning change request conformed with the 2000 Tri-lakes Comprehensive Plan. The letter further explained that relevant agencies had already signed off on the various studies, plans, and reports submitted by LRA with respect to the suitability of the subject property for rezoning.

On May 9, 2003, Mr. Schmidt and Red Rock Ranch executed a purchase agreement for the sale of the adjacent property to Mr. Schmidt for $1.25 million. On May 27, 2003, Mr. Schmidt obtained land title insurance on the adjacent property. On August 5, 2003, Mr. Schmidt terminated the purchase agreement with Red Rock Ranch.

When Mr. Schmidt terminated the purchase agreement the zone change and preliminary plan applications were ready to be forwarded to the El Paso County Planning Commission and the El Paso County Board of County Commissioners for public hearing. It is highly probable that the El Paso County Development Services Department would have endorsed both applications, and approval would have vested the subdivision's development entitlements. Following approval, the proposed subdivision would have entered the final plat phase, in which several local entities would review the previously approved zoning and preliminary plan entitlements.

**[*9]**   Because he was listed on the zone change and preliminary plan applications, Mr. Schmidt could have severed the subject property from the adjacent property and pursued rezoning and a preliminary plan for the subject property alone under the existing applications.  However, because the pending applications were nontransferable, a new owner would have had to submit new applications.

V.   Conservation Easement

At some point during the development process for the proposed Raspberry Ridge subdivision, Mr. Schmidt considered granting a conservation easement on the subject property.  Mr. Schmidt engaged the services of W.D. Park of Park & Associates to value the proposed easement.

In a preliminary development cost analysis dated May 12, 2003 (May 12, 2003, cost estimate), LRA estimated the following development costs and development costs per lot for the proposed Raspberry Ridge subdivision:

| Costs | Nevins (19.5 lots) | Schmidt (13.5 lots) | Combined (33 lots) |
|---|---|---|---|
| Development costs | $862,045 | $353,339 | $1,215,383 |
| Development costs per lot | 44,207 | 26,173 | 36,830 |

The May 12, 2003, cost estimate refers to the Nevins units as "phase 1" and the Schmidt units as "phase 2" and assumes for other purposes that the Nevins units

[*10] would sell for $225,000 per lot and that the Schmidt units would sell for $300,000 per lot.[6]

On or about May 14, 2003, Mr. Park met with Mr. Schmidt and Mr. Jones to discuss the valuation of the easement.[7] By a fax dated May 29, 2003, Mr. Jones followed up on the May 14, 2003, meeting by providing to Mr. Park development cost information from other projects he had worked on.

On May 30, 2003, Michael G. Figgs, a natural resources planner and the president of LREP, Inc., inspected the subject property for the purpose of preparing a baseline report for the proposed conservation easement. In July 2003 Mr. Figgs prepared the baseline report.

In a letter dated June 10, 2003, Mr. Park notified Mr. Schmidt that his firm had concluded that the value of the proposed conservation easement would be $1.6 million. Mr. Park stated that, in reaching this conclusion, his firm estimated that the before value of the subject property was $2 million and the after value was $400,000. Mr. Park subsequently provided to Mr. Schmidt an appraisal of the

---

[6]At trial Mr. Jones testified that the terms "phase 1" and "phase 2" were not meant to signify that the subdivision would be developed in phases.

[7]Respondent introduced three pages of Mr. Park's handwritten notes, at least one of which was from the May 14, 2003, meeting. An undated page of these notes anticipates finished lot selling prices of approximately $175,000 per lot and an easement value of approximately $672,500.

[*11] proposed conservation easement with a valuation date of July 25, 2003 (2003 appraisal), in which he reached the same conclusions as he previously reached in the June 10, 2003, letter. Mr. Park used a discounted cashflow analysis to determine a before value for the subject property. He relied on the May 12, 2003, cost estimate for the development cost input in his discounted cashflow analysis.

On July 3, 2003, Mr. Schmidt entered into a due diligence agreement with respect to the proposed conservation easement with El Paso County's board of commissioners. Concurrently, El Paso County passed a resolution approving and accepting the due diligence agreement and the form of the proposed conservation easement. During July 2003 petitioners began construction of their personal residence on the subject property. On August 1, 2003, Mr. Schmidt executed an easement deed, granting a conservation easement on the subject property to El Paso County. The conservation easement permitted one homesite on the subject property.

VI.   Red Rock Reserve Project

On or about August 29, 2003, Red Rock Ranch entered into a contract to sell the adjacent property to an unrelated developer, Raspberry Ridge Development, RLLP, a Colorado registered limited liability limited partnership

[*12] (Raspberry Ridge Development), for $1.25 million.  On November 13, 2003, Raspberry Ridge Development purchased the adjacent property for $1.25 million.

Raspberry Ridge Development did not purchase the pending rezoning and preliminary plan applications submitted by LRA with respect to the Raspberry Ridge subdivision.  Instead, it submitted new applications for a residential subdivision called the Red Rock Reserve project.  During 2005 El Paso County approved the rezoning of the adjacent property.  Approval of the final plat for the Red Rock Reserve project was delayed by the presence of the Preble's meadow jumping mouse[8] on the adjacent property.  In early 2006 El Paso County approved the final plat for the Red Rock Reserve project.

_____

[8]The Preble's meadow jumping mouse is currently listed by the U.S. Fish and Wildlife Service as a threatened species.  See U.S. Fish and Wildlife Service, Endangered Species, Mountain-Prairie Region, Preble's Meadow Jumping Mouse, http://www.fws.gov/mountain-prairie/species/mammals/preble/ (last visited July 8, 2014).  It

> is a small mammal approximately 9-inches in length with large hind feet adapted for jumping, a long bicolor tail (which accounts for 60% of its length), and a distinct dark stripe down the middle of its back, bordered on either side by gray to orange-brown fur.  This largely nocturnal mouse lives primarily in heavily vegetated, shrub dominated riparian (streamside) habitats and immediately adjacent upland habitats along the foothills of southeastern Wyoming south to Colorado Springs along the eastern edge of the Front Range of Colorado. * * *

Id.

[*13] VII.   Petitioners' Reporting Position

Petitioners timely filed Forms 1040, U.S. Individual Income Tax Return (returns), for 2003, 2004, 2005, and 2006.  Petitioners claimed a charitable contribution deduction of $1.6 million on a Form 8283, Noncash Charitable Contributions, attached to their 2003 return.  The entire $1.6 million deduction related to the conservation easement that Mr. Schmidt granted to El Paso County on the subject property.  Because of limitations petitioners claimed only $325,407 of the contribution on a Schedule A, Itemized Deductions, attached to their 2003 return.  Petitioners carried over the remainder of the charitable contribution deduction and claimed portions of it on their 2004, 2005, and 2006 returns.

VIII.   Notice of Deficiency

On November 28, 2011, respondent issued to petitioners a notice of deficiency with respect to petitioners' 2003, 2004, 2005, and 2006 tax years.  In the notice of deficiency respondent determined that petitioners failed to meet the requirements of section 170 in claiming a charitable contribution deduction for the conservation easement on the subject property.  Alternatively, respondent determined that the correct value of the conservation easement was $195,000.

**[*14]** IX.    Petitioners' Experts

A.    Mr. Park

Petitioners introduced the expert report and testimony of Mr. Park with respect to the value of the conservation easement on the subject property.  Mr. Park is a real estate appraiser who has practiced for over 37 years.  He is certified as an appraiser by the State of Colorado, and he is a member of the Appraisal Institute and holds its MAI and SRA designations.  He is a certified Appraisal Institute instructor and has taught classes for the Appraisal Institute on basic and intermediate appraisal and on the appraisal of conservation easements.  He is also a certified Uniform Standards of Professional Appraisal Practice instructor.

Mr. Park appraises real estate throughout Colorado.  His practice includes residential and commercial appraisal, eminent domain, valuing tracts of vacant land for residential development purposes, and appraisal of conservation easements.

Mr. Park's report is substantially derived from his 2003 appraisal.  Mr. Park used the before and after method to determine the value of the conservation easement.  He determined that the highest and best use of the subject property before the granting of the conservation easement was a residential subdivision, and he used the subdivision development method to determine the before value of

**[\*15]** the subject property.  He also used a method entitled "Direct Sales Analysis" to determine the before value of the subject property.  Mr. Park opined that the before value of the subject property was $2 million.

Mr. Park determined that the highest and best use of the subject property after the granting of the conservation easement was a 40-acre homesite, and he used the market method to determine an after value for the subject property.  Mr. Park opined that the after value of the subject property was $400,000, and he therefore opined that the value of the conservation easement was $1.6 million.

B.     Mr. Jones

Petitioners introduced the expert report and testimony of Mr. Jones with respect to the possible subdivision of the subject property and the costs associated with such development.  Mr. Jones is a professional land planner, landscape architect, and development manager.  He has provided development, design, construction, and management services in El Paso County for over 41 years.  Mr. Jones holds a bachelor's degree in landscape architecture from Kent State University College of Architecture and Environmental Design.

Mr. Jones opined that, if Mr. Schmidt had moved forward with the Raspberry Ridge subdivision applications the subject and adjacent properties would have obtained an RR-2 zoning and preliminary plan approval.  Mr. Jones

**[*16]** further opined that the preliminary development cost estimates in the May 12, 2003, cost estimate were accurate and complete.

X.      Respondent's Expert--Mr. Fellows

Respondent introduced the expert report and testimony of Thomas Fellows with respect to the value of the conservation easement on the subject property. Mr. Fellows is a real estate appraiser who has practiced for over 40 years. He is certified as an appraiser by the State of Colorado, and he is a member of the Appraisal Institute and holds its MAI designation. He is experienced in appraising conservation easements.

Mr. Fellows used the before and after method to determine the value of the conservation easement. He determined that the highest and best use of the subject property before the granting of the conservation easement was a residential subdivision developed in conjunction with the adjacent property. He used both the market and subdivision development methods to determine a before value for the subject property. Mr. Fellows opined that the subject property had a before value of $750,000.

Mr. Fellows determined that the highest and best use of the subject property after the granting of the conservation easement was a 40-acre homesite. He used the market method to determine an after value for the subject property. He opined

[*17] that the after value of the subject property was $270,000, and he therefore opined that the value of the conservation easement was $480,000.

At trial petitioners introduced a supplemental report prepared and submitted to the Court by respondent's expert, Mr. Fellows.[9] In his supplemental report Mr. Fellows acknowledges that his original report erroneously stated that new zoning and preliminary plan applications would have been required to develop the lots on the subject and adjacent properties in 2003. He explained that he was misled by an employee of El Paso County Development Services. However, despite acknowledging this error and that a shorter holding period could result in an increased value when factored into his discounted cashflow models, Mr. Fellows concluded that his original report correctly determined the before value of the subject property.

XI.    Posttrial Stipulations

After a trial the parties submitted a joint report in which they stipulated certain areas of agreement and disagreement with respect to the value of the conservation easement at issue in this case.

---

[9]Respondent did not offer the supplemental report into evidence.

[*18]                    ULTIMATE FINDINGS OF FACT

Before Mr. Schmidt granted the conservation easement the subject property could have been developed as a 13-lot subdivision either separately or in conjunction with the development and subdivision of the adjacent property.  The mean lot selling price for the finished lots on the subject property would have been $220,000 and would have appreciated at a rate of 6% per annum.  A prospective buyer could have developed the subject property and begun selling lots within 12 months from the easement grant date.  It is likely that all 13 lots on the subject property would have sold within two years of being offered for sale.  Development costs for a hypothetical subdivision of the subject property would have been $580,416.  Marketing/administrative costs for a hypothetical subdivision of the subject property would have been 10% of gross sales.  The appropriate discount rate is 22%.

The before value of the subject property is $1,422,445.  The after value of the subject property is $270,000.  Accordingly, the value of the conservation easement is $1,152,445.

**[*19]**                                                OPINION

I.       Burden of Proof

Generally, the taxpayer bears the burden of proving that he is entitled to any claimed deduction. See Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). However, if a taxpayer produces credible evidence[10] with respect to any factual issue relevant to ascertaining the taxpayer's tax liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary[11] for witnesses, information, documents, meetings, and interviews. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). The taxpayer bears the burden of proving that all of the

---

[10]"'Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness).'" Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[11]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[\*20]** requirements of section 7491(a) have been satisfied.  See Rolfs v.

Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Petitioners contend that the burden of proof should shift to respondent

pursuant to section 7491(a) because they introduced credible evidence and

cooperated with respondent.  Respondent contends that petitioners have not

satisfied the requirements of section 7491(a)(1) and (2).

Petitioners point to stipulated exhibits that show that they voluntarily agreed

to extend the period of limitations for four years during the audit and to the fact

that respondent has not filed a motion to compel discovery in this case.  Both of

these points, however, fail to carry petitioners' burden of showing that they

cooperated with respondent.  To meet their burden petitioners were required to

produce evidence showing that they "cooperated with reasonable requests by the

Secretary for witnesses, information, documents, meetings, and interviews".  Sec.

7491(a)(2)(B).  The limited evidence that petitioners introduced regarding their

conduct during the examination falls short of demonstrating that they cooperated

with respondent's reasonable requests during the examination.  Accordingly, the

burden of proof remains with petitioners with respect to the deficiencies at issue in

this case.

[*21] II.    Conservation Easements Generally

Section 170(a)(1) provides that a deduction is allowed for any charitable contribution that is paid within the taxable year.  "The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar Endowment, 477 U.S. 105, 118 (1986).  If a taxpayer makes a charitable contribution of property other than money, in general, the amount of the contribution is equal to the fair market value of the property at the time of the contribution.  See sec. 1.170A-1(c)(1), Income Tax Regs.

Generally, a taxpayer may not deduct the value of a contribution of property that consists of less than the taxpayer's entire interest in that property.  See sec. 170(f)(3).  However, a taxpayer is allowed a charitable contribution deduction for a qualified conservation contribution.  See sec. 170(f)(3)(B)(iii).  "A qualified conservation contribution is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes."  Sec. 1.170A-14(a), Income Tax Regs.  "A perpetual conservation restriction is a qualified real property interest", sec. 1.170A-14(b)(2), Income Tax Regs., that is defined as "a restriction granted in perpetuity on the use which may be made of real property--including, an easement or other interest in real property that under

**[*22]** [S]tate law has attributes similar to an easement (e.g., a restrictive covenant or equitable servitude)"[12], id.

> Section 1.170A-14(h)(3)(i), Income Tax Regs., states in relevant part:
>
> The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution. See § 1.170A-7(c). If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

See generally Hilborn v. Commissioner, 85 T.C. 677, 688-689 (1985). Because a market for the purchase and sale of conservation easements rarely exists, see Symington v. Commissioner, 87 T.C. 892, 895 (1986), a conservation easement's value is ordinarily determined by measuring the diminution in value of the affected property resulting from the creation of the easement (before and after method), see sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

---

[12]"For purposes of this section, the terms 'easement', 'conservation restriction', and 'perpetual conservation restriction' have the same meaning." Sec. 1.170A-14(b)(2), Income Tax Regs. We will use the term "conservation easement" to describe that common meaning.

**[*23]** Generally, the fair market value of property is determined by taking into account the highest and best use of that property on the relevant valuation date. See, e.g., Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-1(c)(2), Income Tax Regs. With respect to the valuation of conservation easements using the before and after method, the regulations further provide that

> the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use. * * *

Sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

A determination of fair market value is largely a factual inquiry in which the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Nat'l Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. at 896. Three methods are generally employed to measure the fair market value of property: (1) the market method, (2) the income method, and (3) the replacement cost method. The question of which method to apply in a particular case is a question of law. See Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 325-326 (2013).

**[\*24]** The market method values a property by comparing the property to similar properties sold in arm's-length transactions in or about the same period.  See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).  The prices of comparable properties are adjusted to create parity between those properties and the property being valued for comparative purposes.  The reliability of the market method depends upon the comparability of the property selected and the reasonableness of the adjustments made to establish comparability.  See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19-20.

The income method values a property by capitalizing or discounting expected cashflow from the property.  Property value is determined under this method by adding the sum of the present value of the expected cashflow and the present value of the residual value of the property.  See Crimi v. Commissioner, T.C. Memo. 2013-51, at \*64.  The subdivision development method is a variation of the income method previously recognized by this Court.  See, e.g., Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, 98 T.C.M. (CCH) 601, 610 (2009); Glick v. Commissioner, T.C. Memo. 1997-65, 73 T.C.M. (CCH) 1925, 1929 (1997).  The subdivision development method values undeveloped

[*25] land by treating the property as if it were subdivided, developed, and sold.[13]

See Consol. Investors Grp. v. Commissioner, 98 T.C.M. (CCH) at 610 (citing

Glick v. Commissioner, T.C. Memo. 1997-65).

The replacement cost method values a property by determining the cost to

reproduce it less applicable depreciation or amortization. See Chapman Glen Ltd.

v. Commissioner, 140 T.C. at 327. The parties agree that the replacement cost

method is not a reliable method for determining the fair market value of the

subject property.

III.     Expert Reports Generally

An expert's opinion is admissible if it assists the trier of fact to understand

the evidence or to determine a fact in issue. Fed. R. Evid. 702. We evaluate

expert opinions in light of each expert's qualifications and the evidence in the

---

[13]The subdivision development method consists of six primary steps. See Crimi v. Commissioner, T.C. Memo. 2013-51, at *64 n.28 (citing Appraisal Institute, The Appraisal of Real Estate 370-376 (13th ed. 2008)). First, the property's highest and best use is determined. Second, the market method is used to identify comparable finished (developed) lots and a per-lot value is derived. Third, anticipated gross proceeds from the sale of the developed lots are calculated by multiplying the per-lot value by the total number of estimated finished lots. Fourth, expected net proceeds are calculated by reducing the expected gross proceeds by direct and indirect costs and entrepreneurial profit. Fifth, net sales proceeds are discounted to present value at a market-derived rate over the development and market absorption period. Sixth, appropriate discounts for lack of marketability, partition, and market absorption are applied where appropriate. The resulting figure equals the indicated value of the undeveloped land.

[*26] record.  See Parker v. Commissioner, 86 T.C. 547, 561 (1986).  Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).  We are not bound by an expert's opinion and may accept or reject an expert opinion in full or in part in the exercise of sound judgment.  See Helvering v. Nat'l Grocery Co., 304 U.S. at 295; Parker v. Commissioner, 86 T.C. at 561-562.  We may also reach a decision as to value based on our own examination of the evidence in the record. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

Before we turn to the valuation of the conservation easement at issue, we first address two preliminary issues that the parties raised on brief.

IV.    Mr. Park's Credibility

Respondent argues that we should discount Mr. Park's report because of various misrepresentations in his report and his testimony at trial.  First, respondent criticizes Mr. Park for assuming in his report that "[t]he development had been approved for final platting" whereas the record shows that the development applications were still pending.  Second, respondent criticizes Mr. Park for significantly increasing his valuation of the conservation easement in his

[*27] valuation report from the initial estimate he made in his handwritten notes. Third, respondent criticizes Mr. Park for stating that no one provided him any assistance in preparing his report even though he copied an introductory portion of his report from an amicus brief in another case that petitioners' counsel provided to him.

We do not agree with respondent that Mr. Park's report should be significantly discounted for these reasons. First, although Mr. Park appears to have misstated or misunderstood the status of the pending development applications, this error does not seem to have significantly affected his conclusion regarding the before value of the subject property because his discounted cashflow analysis assumes that none of the finished lots would be sold during the first year. Second, it is unclear when the handwritten notes were prepared and for what purpose.[14]  It is possible that Mr. Park prepared these handwritten notes before he began his research into the before value of the subject property. Third, we understand Mr. Park's testimony that he received no assistance in preparing the report to refer to the technical aspects of the report. Respondent has not shown

---

[14]The discounted cashflow analysis is on ruled paper whereas the page dated May 14, 2003, is on plain paper. We infer from this that the various handwritten notes may not have been prepared at the same time.

[*28] that Mr. Park's report is not his own; indeed, it is substantially the same as his 2003 appraisal.

That said, we are mindful of the "cottage industry of experts who function primarily in the market for tax benefits". Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 335 (2011). Accordingly, the credibility of both parties' experts largely depends on the extent to which their reports are supported by relevant and reliable data and reflect sound and objective reasoning.

## V.    Mr. Schmidt's Opinion Testimony

At trial Mr. Schmidt testified that he agreed with Mr. Park's 2003 appraisal and disagreed with Mr. Fellows' report. Petitioners contend that Mr. Schmidt's testimony should be given significant weight.

Under rule 702 of the Federal Rules of Evidence a landowner is competent to offer opinion testimony with respect to the value of his or her property. See Fed. R. Evid. 702 Advisory Committee Note ("[W]ithin the scope of the rule are not only experts in the strictest sense of the word * * * but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."); LaCombe v. A-T-O, Inc., 679 F.2d 431, 434 n.4 (5th Cir. 1982); Estate of Dunia v. Commissioner, T.C. Memo. 2004-123, 87 T.C.M. (CCH) 1353, 1355 (2004). Although petitioners failed to list Mr. Schmidt in their pretrial

**[*29]** memorandum as an expert witness and he did not submit an expert report as required under Rule 143(g), see Estate of McCampbell v. Commissioner, T.C. Memo. 1991-141, 61 T.C.M. (CCH) 2263, 2270 (1991), respondent did not object to Mr. Schmidt's testimony and we allowed his opinion testimony.

In agreeing with Mr. Park's 2003 appraisal Mr. Schmidt offered no independent analysis other than to agree to the comparables that Mr. Park used in his 2003 appraisal. Mr. Schmidt also criticized the comparables that Mr. Fellows used in his report. Because Mr. Schmidt's opinion as to the value of the conservation easement is based on and is supported only by Mr. Park's 2003 appraisal, we give it weight only to the extent that we find Mr. Park's report--which is substantially the same as his 2003 appraisal--to be reliable. See Sanborn v. Commissioner, T.C. Memo. 1983-579, 46 T.C.M. (CCH) 1435, 1147 (1983) (citing Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 699 (5th Cir. 1975)). However, to the extent that Mr. Schmidt explained why he disagreed with the comparables that Mr. Fellows selected, we give Mr. Schmidt's testimony appropriate weight.

We turn now to the valuation of the conservation easement at issue. We do so using the before and after method. See sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

**[\*30]** VI.     <u>Before Value of the Subject Property</u>

With respect to the before value of the subject property, the parties agree that both the market and subdivision development methods are appropriate, but the parties disagree with respect to which one of these methods is more appropriate in this case.

A.     <u>Market Method</u>

The parties disagree about the use of the market method for determining a before value for the subject property. Petitioners contend there is insufficient data available to use the market method. Respondent disagrees.

Mr. Park did not use the market method to determine a before value for the subject property because he could not find adequate sales of comparable properties.[15] By contrast, Mr. Fellows used the market method to determine a before value for the subject property. In his rebuttal report Mr. Park explained that he rejected the comparables that Mr. Fellows used because he thought that they lacked the development entitlements that Mr. Schmidt had secured for the subject property.

---

[15]Mr. Park prepared an alternative analysis that he called a "direct sales analysis". This analysis purports to measure the difference in value between comparable properties before and after they obtain entitlements. We do not find this analysis to be relevant or helpful because the subject property had not yet obtained development entitlements by the conservation easement grant date.

**[*31]** Mr. Fellows identified four sales of raw land that he determined to be comparable to a hypothetical sale of the subject property before the granting of the conservation easement. Those sales are: (1) the prior sale of the subject property to Mr. Schmidt in May 2000; (2) the sale of the adjacent property to Raspberry Ridge Development in November 2003; (3) the sale of a property in the South Black Forest area, east of Interstate 25, in May 2001; and (4) a second sale of a property in the South Black Forest area in April 2004. Mr. Fellows adjusted the first and third property sales to account for market conditions using a factor of 5% per annum. The approximate dates, selling prices, areas in acres, prices per acre, and adjusted prices per acre of the sales are as follows:

| Property | Date | Selling price | Acres | Price per acre | Adjusted price per acre |
|---|---|---|---|---|---|
| Subject property | 5/00 | $525,000 | 40.00 | $13,125 | $15,094 |
| Adjacent property | 11/03 | 1,250,000 | 67.90 | 18,409 | 18,409 |
| Black Forest 1 | 5/01 | 805,000 | 81.80 | 9,841 | 10,825 |
| Black Forest 2 | 4/04 | 560,000 | 44.35 | 12,627 | 12,627 |

After comparing the physical characteristics of the comparable sale properties Mr. Fellows concluded that the prior sale of the subject property and the subsequent sale of the adjacent property were most relevant in determining a before value for the subject property. Consequently, Mr. Fellows concluded that

[*32] the subject property had a before value of $18,000 to $19,000 per acre and that it therefore had an estimated before value of $700,000 to $800,000.

Respondent contends that Mr. Park wrongly rejected Mr. Fellows' comparables because the subject property had no development entitlements when Mr. Schmidt granted the conservation easement. Respondent notes that petitioners' land-use expert, Mr. Jones, stated in his report that the rezoning and preliminary plan applications for the subject property were "ready to be forwarded to the El Paso County Planning Commission and the El Paso County Board of County Commissioners for public hearing." Respondent further contends that the fact that the rezoning and preliminary plan applications were still pending and likely to be granted does not distinguish the subject property from the comparables that Mr. Fellows selected because the pending applications were nontransferable. We disagree.

Even though the pending applications were nontransferable, the record establishes that the applicants had been able to address all relevant issues that could have prevented or delayed the granting of development entitlements for the subject property[16] and that the proposed development of the subject property was

---

[16]By contrast, development of the adjacent property was delayed by the presence of the Preble's meadow jumping mouse.

[*33] consistent with the 2000 Tri-lakes Comprehensive Plan.  Moreover, as Mr. Fellows recognized but did not fully account for, much of the work that LRA had done was transferable even if the applications themselves were not.  Finally, as petitioners note in their answering brief, Mr. Schmidt could have sold the subject property subject to his first securing the development entitlements with the pending applications.

Respondent contends that all of this is irrelevant because the before and after method is concerned only with what a hypothetical purchaser would have paid for the subject property.  However, the regulations look to the before and after method to value conservation easements only where there is no substantial record of comparable easement sales, see sec. 1.170A-14(h)(3)(i), Income Tax Regs., and even then, the before and after value method is not always conclusive, see id.  Rather, what the before and after method is trying to measure is the price that a hypothetical purchaser of a conservation easement would have to pay a hypothetical seller for the easement.  Because a hypothetical seller of a conservation easement on the subject property would agree to sell the easement only for an amount that adequately accounted for the value of the development work that had been accomplished to that date, we find that the comparables selected by Mr. Fellows are insufficiently comparable to the subject property and

[*34] that the market method is not the appropriate method to use to determine the before value of the subject property.  See, e.g., Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982) ("Certainly, the hypothetical sale should not be constructed in a vacuum isolated from the actual facts[.]").

B.    Subdivision Development Method

The parties agree that, if the subdivision development method is used, the following factors are relevant to the preparation of the discounted cashflow analysis that would be required to determine the before value of the subject property:  (1) the number of lots; (2) the retail lot selling prices; (3) the retail lot selling price appreciation rate, (4) the time required to obtain entitlements, (5) the absorption rate of the lots, (6) development costs, (7) marketing/administrative costs, and (8) the discount rate.

1.    Number of Lots

The parties agree that, if the subject property was developed as a stand-alone, 40-acre subdivision, the subject property would yield thirteen 2.5-acre lots. The parties further agree that, if the subject property was developed as part of the originally proposed 108-acre subdivision, the development as a whole would yield thirty-five 2.5-acre lots, 13 of which would be on the subject property.

**[*35]**     2.     Retail Lot Selling Prices

The parties disagree with respect to the ultimate retail lot selling prices for lots developed on the subject property. Petitioners contend that the retail lots would sell for $250,000 to $300,000 per lot. Respondent contends that the retail lots would sell for no more than $220,000 per lot.

a.     Mr. Park's Report

Mr. Park prepared an analysis of the selling prices of comparable finished lots (finished lot sales analysis). Mr. Park identified sales of five specific comparable lots with addresses on the following streets: (1) Colonial Park Drive, (2) Embassy Court, (3) High Forest Road, (4) Willow Stone Height, and (5) Stratton Woods View. Mr. Park adjusted the sale prices for these lots to account for differences in location, density, topography, view, and whether the lot is in a gated community as follows:

| [*36] | Colonial Park Drive | Embassy Court | High Forest Road | Willow Stone Height | Stratton Woods View |
|---|---|---|---|---|---|
| Sale price | $210,000 | $225,000 | $295,000 | $360,000 | $480,000 |
| Sale date | 3/22/02 | 5/28/03 | 3/31/03 | 5/15/02 | 4/15/03 |
| Adjustments | | | | | |
| Location | .00 | .00 | .10 | (.10) | (.10) |
| Density | .00 | .00 | .00 | .05 | .00 |
| Topography | .10 | .10 | .10 | .00 | .00 |
| View | .30 | .20 | .10 | .10 | .10 |
| Gated community | .00 | .00 | (.20) | (.20) | (.20) |
| Total adjustments | .40 | .30 | .10 | (.15) | (.20) |
| Indicated value | $294,000 | $292,500 | $324,500 | $306,000 | $384,000 |

The first two of these lots are in the Bent Tree subdivision; the third lot is in the High Forest Ranch subdivision; the fourth lot is in the Broadmoor Resort Community subdivision; and the fifth lot is in the Stratton Forest subdivision. The Bent Tree and High Forest Ranch subdivisions are in northern El Paso County, and the Broadmoor Resort Community and Stratton Forest subdivisions are in the southwestern quadrant of Colorado Springs, where some of the more expensive lots in the region are located.

In his report Mr. Park stated as follows: "The lots created by the subdivision would have above average to excellent views, would be heavily

[*37] wooded and would have considerable market value after the completion of the subdivision process."

### b. Mr. Fellows' Report

Mr. Fellows also prepared a finished lot sales analysis. In his finished lot sales analysis Mr. Fellows collected sales data from numerous subdivisions in the northern El Paso County market. Mr. Fellows then selected a sample of the data that he considered to be representative.[17] The sample that Mr. Fellows selected comprised lot sales during 2002-03 in the following subdivisions: (1) Forest View 3; (2) Wissler; (3) Kings Deer; (4) Bent Tree; and (5) Tall Pines. With the exception of the Forest View 3 subdivision, all of the subdivisions are east of Monument and Interstate 25. The number of lot sales, low price, high price, and mean price for these subdivisions are as follows:

---

[17]In his rebuttal report Mr. Fellows noted that he also obtained sales data for 2002-03 with respect to High Forest Ranch subdivision but chose not to include it because he considered it to be superior to the subject property. The number of lot sales, low price, high price, and mean price for the subdivision are as follows:

| | No. of sales | Low price | High price | Mean price |
|---|---|---|---|---|
| High Forest Ranch | 17 | $155,000 | $320,000 | $223,700 |

| [*38] | No. of sales | Low price | High price | Mean price |
|---|---|---|---|---|
| Forest View 3 | 11 | $154,000 | $160,000 | $156,545 |
| Wissler | 12 | 122,500 | 156,000 | 141,269 |
| Kings Deer | 24 | [1]95,000 | 200,000 | 139,978 |
| Bent Tree | 11 | 108,000 | 250,000 | 159,091 |
| Tall Pines | 5 | 145,500 | 180,000 | 177,500 |

[1]Mr. Fellows' report erroneously states that the low price for the Kings Deer subdivision was $170,000. However, an addendum to his report contains a table that shows that the lowest lot sale price for the Kings Deer subdivision was $95,000.

Mr. Fellows determined the mean selling price of the lots in each of the comparable subdivisions and adjusted that price to account for differences between the hypothetical subdivision on the subject property and the subdivisions included in his data set. However, Mr. Fellows did not specify what factors he considered in adjusting the mean prices. Mr. Fellows concluded that the average selling price for the 13 finished lots on the subject property would be between $175,000 and $200,000 as of the valuation date. In two of his three models he assumed a mean lot selling price for the subject property of $200,000.

In his rebuttal report Mr. Fellows explained the difference between his and Mr. Park's conclusions as follows:

[Mr. Park] gives significant weight to views and trees. I agree that these are significant amenities. However, both are highly subjective.

**[*39]** There is a difference between city views and views of Pike's Peak. There are differences between Colorado Springs city views and Monument city views. Again, the issue is subjective.

During my inspection of subject property, I noted several locations that offer excellent views of the Monument area. I also noted interior and westerly lots that had ordinary views. Also, tree cover is not uniform over the property.

### c. Analysis

We do not find the analysis of either expert report with respect to the retail lot selling prices to be complete and convincing. Mr. Park's finished lot sales analysis included lot sales from the High Forest Ranch, Broadmoor Resort Community, and Stratton Woods View subdivisions. All of these subdivisions are part of gated communities and have numerous amenities that would not be present in the subdivision contemplated by Mr. Park's report. Additionally, both the Broadmoor Resort Community and the Stratton Woods View subdivisions are in Colorado Springs. See Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 329 (2012) (rejecting the use of nonlocal comparables), aff'd in part, vacated in part on another issue and remanded, ___ F.3d ___, 2014 WL 2609866 (5th Cir. June 11, 2014); Whitehouse Hotel Ltd. P'ship v. Commissioner, 131 T.C. 112, 157 & n.19 (2008) (same), vacated on another issue, 615 F.3d 321 (5th Cir. 2010). Although Mr. Park adjusted the selling prices of these lots to account for some of

[*40] these amenities and distinctions, his inclusion of such dissimilar comparables calls into question the reliability of his conclusions.

Mr. Fellows' finished lot sales analysis included only lot sales from subdivisions that he considered to be inferior to a hypothetical subdivision on the subject property. Although Mr. Fellows adjusted for the quality of the comparables that he used, he did not specify the factors he considered in adjusting the mean lot selling prices for these subdivisions. Additionally, Mr. Fellows' analysis included mean lot sales from subdivisions with significant variations in finished lot selling prices. However, his report does not compare hypothetical individual finished lots on the subject property to any of the individual lots in any of his comparable subdivisions. Although Mr. Fellows explained that some of the finished lots on the subject property would not have excellent views and that tree cover was not uniform over the subject property, other factors suggest that the finished lots would not be subject to extreme price variations. For example, the subject property was relatively flat, and only 1 of the 13 proposed lots on the subject property was flagged as having a potential topographical or geological issue. Moreover, the interior and westerly lots that Mr. Fellows considered to have ordinary views had other amenities, such as more significant tree cover and closer proximity to Pike National Forest. Significantly, Mr. Fellows' rebuttal

[*41] report does not suggest that any of the finished lots on the subject property would be inferior to the two Bent Tree subdivision lots that Mr. Park identified in his report or that any of the finished lots on the subject property would be comparable to any of the lower priced lots in the Bent Tree subdivision.

Respondent contends that Mr. Fellows' analysis is supported by our approval of a statistical approach in Crimi v. Commissioner, at *76. However, in Crimi, the taxpayers' expert "developed a statistical model using polynomial regression to correlate a relationship between the number of lots into which an undeveloped parcel of land may be subdivided and the sale price per lot." Id. at *74. Here, by contrast, Mr. Fellows did not develop a statistical model to derive useful data from dissimilar comparables. Rather, his approach served only to allow him to include many inferior lots in his analysis.

Because we do not find either expert's report with respect to the finished lot selling prices to be complete and convincing, we adopt the conclusions of neither report. Instead, after giving appropriate weight to each expert's report, we draw our own conclusions based on our examination of the evidence in the record. The sales of the two Bent Tree subdivision lots on which Mr. Park relied, which we find to be sales of the most comparable lots in the record, had selling prices of $210,000 and $225,000, respectively. Because of the small sample size and the

[*42] subjective nature of Mr. Park's adjustments to these lot sale prices we decline to adopt Mr. Park's adjustments. Placing slightly more weight on the sale of the second of the Bent Tree subdivision lots because it occurred closer in time to the conservation easement grant date, we estimate that the mean lot selling price for the finished lots on the subject property would have been $220,000.

### 3. Retail Lot Price Appreciation Rate

The parties agree that the selling prices for the retail lots would appreciate at a rate of 6% per annum.

### 4. Timing To Obtain Entitlements

The parties disagree with respect to how long it would take to obtain entitlements to develop the subject property and whether to take into account the zone change and preliminary plan approval applications associated with the proposed Raspberry Ridge subdivision. Petitioners contend that Mr. Schmidt would have obtained preliminary approval of the proposed Raspberry Ridge subdivision applications within three to four months from the easement grant date. Respondent contends that a hypothetical buyer would have obtained final approval of a subdivision on the subject and adjacent properties in approximately 24 months. Accordingly, respondent contends that it would have taken at least 24 months for a hypothetical buyer to begin selling developed lots.

**[*43]** Mr. Park assumed in his report that the time required for development of the lots was 12 months. Mr. Jones estimated in his rebuttal report that Mr. Schmidt could have secured final plat approvals by February 2004 and begun selling developed lots on the subject and adjacent properties by March 2004.

Respondent agrees that Mr. Schmidt could have obtained preliminary approval for a subdivision on the subject and adjacent properties on the basis of the applications for the proposed Raspberry Ridge subdivision but contends that this is irrelevant because the zone change and preliminary plan applications were nontransferable. However, we concluded above, see supra part VI.A, that the pending applications are relevant in determining the price that a hypothetical buyer of the conservation easement would have to pay to a hypothetical seller for the easement and that much of the work that had been done was transferable even if the entitlement applications themselves were not. We conclude that a prospective buyer could have developed the subject property and begun selling lots within 12 months from the conservation easement grant date.

### 5. Lot Absorption

The parties disagree with respect to the amount of time it would take for the market to absorb the retail lots. Petitioners contend that the 13 lots would have

[*44] sold within 12 months.  Respondent contends that the lots would have sold at a rate of approximately 5 to 6 per annum.

Mr. Jones credibly testified that Mr. Schmidt could have developed the 13 lots on the subject property in a first phase and the 22 lots on the adjacent property in a second phase.  Mr. Jones further testified that, to develop the lots on the subject property before the lots on the adjacent property, a prospective buyer would have had to secure access for the subject property to the road that was accessible from the adjacent property.[18]  Mr. Fellows' report also recognized that access was an issue that would need to be resolved, but he noted that "[t]his is a common character of real estate".  Respondent contends that developing the lots on the subject property separately would subject a hypothetical purchaser to increased development costs.  However, as discussed below, see infra part VI.B.6, petitioners concede the development costs issue.  Accordingly, because Mr. Fellows considered the access issue in his report, no further adjustment for any increased development costs for developing the lots on the subject property before the lots on the adjacent property is necessary.

_____

[18]Mr. Jones testified that, under local ordinances, the owner of the adjacent property would have to provide road access to the subject property before being allowed to subdivide the adjacent property.

**[*45]**          a.     <u>Mr. Park's Report</u>

Mr. Park determined that all of the finished lots on the subject property would sell within 12 months. Mr. Park relied on an absorption study and on sales data from a representative subdivision.

Mr. Park's absorption study identified 140 comparable lots in the same market as the subject property that were listed for sale during 2002-03. During that time 105 of the lots sold.

Mr. Park also relied on sales data from the Walters Commons subdivision in the Woodmor area in northern El Paso County. The Walters Commons subdivision contains 174 lots. They were sold from December 2003 to July 2008 at a rate of approximately 3.22 sales per month. Mr. Park concluded that the rate of sales in the Walters Commons subdivision supported his estimate of a 12-month absorption period.

          b.     <u>Mr. Fellows' Report</u>

Mr. Fellows determined that the finished lots on the subject property would sell at a rate of five per annum. His determination was based on a survey of the sales rates of five subdivisions during 2002 and 2003 and on a housing market study for El Paso County during this time.

**[*46]**  Mr. Fellows relied on sales data from the following subdivisions:  Forest View 3, Wissler, Kings Deer, Bent Tree, and Tall Pines.  Mr. Fellows summarized the sales data as follows:

|  | Forest View 3 | Wissler | Kings Deer | Bent Tree | Tall Pines |
|---|---|---|---|---|---|
| No. of sales | [1]11.0 | 12.0 | 24.0 | 11.0 | 5.0 |
| Annual avg. no. of sales | [1]5.5 | 6.0 | 12.0 | 5.5 | 2.5 |

> [1]Respondent concedes that Forest View 3 in fact had 13 sales during 2002 and 2003.  However, respondent contends that this error does not materially affect Mr. Fellows' conclusions.

Mr. Fellows also relied on a report entitled "Colorado Springs Single Family Housing Market--April 2003" (Bamberger Report).  The Bamberger Report reported that there was a 2.4 year supply of upper-end residential lots (i.e., lots that sold for more than $128,000).  After combining his lot absorption estimate with his estimate for the time to obtain entitlements, see supra part VI.B.4, Mr. Fellows estimated a five-year holding period in his discounted cashflow models.  He assumed that five lots would be sold in each of years 3 and 4 and that three lots would be sold in year 5.

c.    Analysis

We do not find the analysis of either expert report with respect to the absorption rate to be complete and convincing.  Mr. Park's absorption study does

**[\*47]** not support his conclusion that all 13 lots on the subject property would sell in one year. Instead, the absorption study indicates that approximately 75% of the lots placed on the market during 2002-03 sold during that period. Mr. Park's analysis of the sales data from the Walters Commons subdivision is similarly unconvincing because it does not follow from the fact that the lots on a 174-lot subdivision sold at a rate of 3.22 per month that a 13-lot subdivision would experience a similar rate of monthly sales. Moreover, the sales data from the Walters Commons subdivision is particularly unconvincing because the Walter Commons subdivision is a high-density townhome development in Monument.

Mr. Fellows' survey of the sales data from the five subdivisions is unconvincing because a closer look at the underlying data shows that all of the lots in each of the five subdivisions sold in less than a year and a half. The sales data for the five subdivisions that Mr. Fellows relied upon shows as follows:

| [*48] | No. of lots sold | First sale | Last sale | No. of months |
|---|---|---|---|---|
| Forest View 3[1] | 11 | 8/14/2002 | 12/31/2003 | 16 |
| Wissler | 12 | 8/15/2002 | 9/12/2003 | 13 |
| Kings Deer | 24 | 7/11/2002 | 11/12/2003 | 16 |
| Bent Tree | 11 | 10/15/2002 | 12/29/2003 | 14 |
| Tall Pines | 5 | 9/3/2002 | 7/23/2003 | 10 |

[1]As discussed later in this paragraph, the sales data with respect to Forest View 3 is inconsistent with other evidence in the record, including copies of patents for each of the lots in Forest View 3. Mr. Fellows testified that he was unaware of the patents when he prepared his report and instead relied on other data.

Although respondent contends that the lots in the Forest View 3 subdivision were offered for sale throughout 2002 and 2003, he cites no evidence in the record to support this contention. In fact, the record shows that the final plat for Forest View 3 was approved by various boards and commissions between February 21 and April 18, 2002, the final plat for the subdivision was recorded on May 24, 2002, and patents for 13 of the 14 platted lots in the subdivision were made between August 9, 2002, and August 22, 2003.[19] This indicates that all of the lots in the Forest View 3 subdivision sold within 17 months of final plat approval.

[19]The 14th lot was pulled off the market and not sold until 2006 because of an issue that arose with respect to that lot.

[*49]  Because we do not find either expert's report with respect to the lot absorption rate to be complete and convincing, we adopt the estimates of neither report.  Instead, after giving appropriate weight to each expert's report, we draw our own conclusions based on our examination of the evidence in the record.  The sales data from the five subdivisions on which Mr. Fellows relied shows that, measuring from the date of the first sale to the date of the last sale, all of the lots in each of the five subdivisions sold in less than a year and a half.  Although the record does not show when the lots in the five subdivisions discussed in Mr. Fellows' survey were initially offered for sale, the record does show that less than five months passed between the approval of the final plat for Forest View 3 and the first lot sale in that subdivision.  Accordingly, we estimate that all 13 lots on the subject property would have sold within two years of being offered for sale.

6.     Development Costs

The parties agree that development costs for the combined 108-acre subdivision would have totaled approximately $1,485,295.  Respondent contends that the amount of the development costs allocable to the subject property is between $40,000 and $45,000 per lot.  At trial petitioners relied on Mr. Jones' expert report.  Mr. Jones' report opines that the amount of the development costs allocable to the subject property is $26,173 per lot.  On brief, however, petitioners

**[\*50]** concede that the amount of the development costs allocable to the subject property is $580,416, or $44,647 per lot. We conclude that the development costs for a hypothetical subdivision of the subject property would have been $580,416.

### 7. Marketing/Administrative Costs

The parties disagree as to the proper amount of marketing/administrative costs. Both Mr. Park and Mr. Fellows included inputs for cost of sales (marketing). Mr. Park included marketing costs equal to 10% of gross sales. Mr. Fellows included marketing and closing costs equal to 7% of gross sales. The 3% difference between Mr. Park's and Mr. Fellows' estimates is partially offset by the "administrative expense" of $10,000 per annum included by Mr. Fellows to account for administrative expenses, taxes, and other miscellaneous holding costs.[20] Paradoxically, Mr. Fellows' estimate supports a lower combined cost for marketing/administrative costs for a subdivision on the subject property--and thus a higher before value for the subject property. Petitioners have not shown that Mr. Fellows' lower estimate is more reliable. See Rule 142(a)(1). We conclude that

---

[20]In the joint status report the parties purported to disagree with respect to the proper amount of carrying/holding costs. Although the parties fail to explicitly address these costs on brief, it appears from Mr. Fellows' report that these are the administrative holding costs that Mr. Fellows included but Mr. Park did not.

[*51] the marketing/administrative costs for a hypothetical subdivision of the subject property would have been 10% of gross sales.

### 8. Discount Rate

The parties agree that the appropriate discount rate is 22%. This rate includes a 10% entrepreneurial-profit factor.

### C. Conclusion

Having determined the respective values of the various inputs that the parties agree are relevant in determining the before value of the subject property using the subdivision development method, we can now recalculate the before value of the subject property using a discounted cashflow model that is similar to the discounted cashflow models used by the parties' experts. Before we do so, however, we address the proper application of the discounted cashflow method in this case.

It is not clear from Mr. Park's report how he calculated the present value of the income and expenses from the hypothetical subdivision of the subject property.[21] Mr. Fellows assumed that a hypothetical developer would receive all income at yearend. However, Mr. Fellows also assumed that the hypothetical

---

[21]Indeed, Mr. Park admitted at trial that his discounted cashflow analysis model contained a significant error.

[*52] developer would pay the development costs at the beginning of the first year. Besides being inconsistent, Mr. Fellows' adoption of a yearend convention is questionable with respect to the facts in this case. In Estate of Heck v. Commissioner, T.C. Memo. 2002-34, 83 T.C.M. (CCH) 1181, 1190 (2002), we adopted a yearend convention because the cashflow being discounted was from the sale of champagne and was therefore more heavily weighted toward the end of the year. See also Estate of Adams v. Commissioner, T.C. Memo. 2002-80, 83 T.C.M. (CCH) 1421, 1424 (2002) (adopting a yearend convention because the Commissioner failed to introduce evidence showing that the corporation "would pay its investors at the middle of the year rather than at the end of the year"). Here, the more reasonable assumption is that the lot sales, and other income and expenses, would occur evenly throughout the year in which they are expected to occur. See John A. Bogdanski, Federal Tax Valuation, para. 3.05[5][b][vi], at 3-135 (2012) (noting that the mid-year convention "better reflects the fact that operating revenues are often received throughout the year"). Accordingly, we adopt a midyear convention in this case.

The following represents our reconstruction of the discounted cashflow analysis of the income and expenses relating to the hypothetical subdivision of the subject property:

| [*53] | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Lot sale price[1] | $226,504 | $240,094 | $254,500 |
| Lot sales | -0- | 6.5 | 6.5 |
| Gross sales | -0- | 1,560,611 | 1,654,250 |
| Marketing costs (10%) | -0- | 156,061 | 165,425 |
| Development costs | 580,416 | -0- | -0- |
| Net | (580,416) | 1,404,550 | 1,488,825 |
| Present value factor (PVF)[2] | 0.905357 | 0.742096 | 0.608276 |
| Discounted value | (525,484) | 1,042,312 | 905,617 |

[1]We estimated that the finished lot sale price as of the conservation easement grant date would have been $220,000. See supra part VI.B.2.c. The parties stipulated that the lot sale price appreciation rate is 6% per annum. See supra part VI.B.3. Because we adopt a midyear convention, the lot sale price is $220,000 * 1.06^{n - 1/2} where n is the year.

[2]A PVF is used to calculate the present value of each dollar received or expended in the future. In general, $PVF = 1 / (1 + r)^n$ where r is the discount rate and n is the year. The parties stipulated that the appropriate discount rate is 22% per annum. See supra part VI.B.8. Because we adopt a midyear convention, $PVF = 1 / (1 + 0.22)^{n - 1/2}$.

The total discounted value of the cashflow from the hypothetical subdivision of the subject property is $1,422,445. After a hypothetical subdivision of the subject property there would be no residual value to the subject property, all the lots having been sold off. Accordingly, the before value of the subject property is $1,422,445.

[*54] VII.    <u>After Value of the Subject Property</u>

The parties agree that the after value of the subject property should be based on sales of other comparable properties with restrictions similar to those imposed by the conservation easement at issue in this case.  The parties disagree, however, with respect to the ultimate after value of the subject property.

A.    <u>Mr. Park's Report</u>

Mr. Park prepared an analysis of the selling prices of comparable, similarly sized lots.  Mr. Park identified comparable lot sales with addresses on the following streets:  (1) Hardy Road; (2) Crowfoot Springs Road; (3) East Jones Road; and (4) Goodson Road.  Mr. Park chose these lots because they lacked development entitlements.  Mr. Park adjusted the sale prices per acre for these lots to account for differences in location, access, density, and topography/view as follows:

[*55]

| | Hardy Road | Crowfoot Springs Road | East Jones Road | Goodson Road |
|---|---|---|---|---|
| Sale price | $300,000 | $300,000 | $335,000 | $320,000 |
| Sale date | 5/30/03 | 4/29/03 | 2/28/03 | 3/15/02 |
| Acres | 40.00 | 42.87 | 52.84 | 40.00 |
| Sale price per acre | $7,500 | $7,000 | $6,300 | $8,000 |
| **Adjustments** | | | | |
| Location | .10 | .10 | .20 | .00 |
| Access/visibility | .10 | .10 | .10 | .00 |
| Topography/view | .30 | .30 | .30 | .30 |
| Total adjustments | .50 | .50 | .60 | .30 |
| Indicated value per acre | $11,250 | $10,500 | $10,080 | $10,400 |

Mr. Park determined that the estimated after value of the subject property is $10,500 per acre, or approximately $400,000 in total.

### B. Mr. Fellows' Report

Mr. Fellows identified property sales in two subdivisions that contained real property platted as 35- to 40-acre lots. These subdivisions are the Highlands Turkey Canyon subdivision near Colorado Springs and the Majestic Park subdivision near Woodland Park. In eight lot sales between July 2001 and November 2004 in the Highlands Turkey Canyon subdivision the mean lot sale price was $4,199 per acre. In 10 lot sales between May 2000 and June 2006 in the Majestic Park subdivision the mean lot sale price was $8,439 per acre. Mr.

**[\*56]** Fellows chose these subdivisions because the 35-40 acre platting made further subdivision unlikely.

Mr. Fellows considered the Highlands Turkey Canyon lots to be inferior and the Majestic Park lots to be superior to the subject property. However, he considered the subject property to be more comparable to the Majestic Park lots. Consequently, Mr. Fellows determined that the after value of the subject property is $6,500 to $7,000 per acre, or between $260,000 and $280,000 in total. In Mr. Fellows' opinion, the after value of the subject property is $270,000.

C.    Analysis

The most significant methodological difference between Mr. Park's report and Mr. Fellows' report with respect to the after value of the subject property is that Mr. Park selected sales of properties that were not platted and Mr. Fellows selected sales of properties that were platted for use as a 35-40 acre residential building site. Mr. Fellows' method seems to more accurately value the subject property after the granting of the conservation easement because the sales of the unplatted lots selected by Mr. Park were still subject to possible rezoning and development as a multilot subdivision. Consistent with Mr. Fellows' conclusion on this issue, we find that the after value of the subject property is $270,000.

**[\*57]** VIII.   Value of the Conservation Easement

We have found that the before value of the subject property is $1,422,445 and that the after value of the subject property is $270,000.  Accordingly, the value of Mr. Schmidt's conservation easement is $1,152,445.

IX.   Penalties

A.   Burden of Proof

Generally, the Commissioner bears the burden of production with respect to the taxpayer's liability for a section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.  Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position.  See Higbee v. Commissioner, 116 T.C. at 447.  However, if the Commissioner first asserts penalties in the answer, the Commissioner has the burden of proof as to the new matter.  See Rule 142(a)(1).

Petitioners contend that the burden of proof with respect to the penalties asserted in this case should be on respondent because they were not included in the notice of deficiency and are therefore new matters.  Respondent concedes that

**[\*58]** he bears the burden of proof with respect to the penalties but contends that petitioners bear the burden of proof with respect to any affirmative defenses to the penalties.

We agree with petitioners that the penalties asserted in this case are new matters, pleaded in the answer. Accordingly, the burden of proof with respect to the penalties, both as to the production of evidence and as to persuasion, is on respondent. See Rule 142(a)(1); Bruner Woolen Co. v. Commissioner, 6 B.T.A. 881, 882 (1927); Derby v. Commissioner, T.C. Memo. 2008-45, 95 T.C.M. (CCH) 1177, 1194 (2008); Arnold v. Commissioner, T.C. Memo. 2003-259, 86 T.C.M. (CCH) 341, 344 (2003).

B.  Section 6662(a) Penalties Generally

Section 6662(a) and (b)(2) and (3) authorizes the Commissioner to impose a 20% penalty on an underpayment of tax that is attributable to, among other things, (1) any substantial understatement of income tax and (2) any substantial valuation misstatement. Only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment. See New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 Fed. Appx. 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

[*59] An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1)(A). With respect to returns filed on or before August 17, 2006, there is a substantial valuation misstatement where the value of any property claimed on any return of tax imposed by chapter 1 is 200% or more of the amount determined to be the correct amount. See sec. 6662(e)(1)(A); Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1219(a)(1)(A), (e)(1), 120 Stat. at 1083, 1085. With respect to returns filed after August 17, 2006,[22] there is a substantial valuation misstatement where the value of any property claimed on any return of tax imposed by chapter 1 is 150% or more of the amount determined to be the correct amount.[23]

---

[22]With respect to valuation misstatements relating to charitable contributions of facade easements PPA's effective date is July 25, 2006. See Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1219(e)(3), 120 Stat. at 1086.

[23]In Chandler v. Commissioner, 142 T.C. ___, ___ (slip op. at 24-25) (May 14, 2014), we held that provisions of the PPA that removed the reasonable cause defense for gross valuation misstatements under sec. 6662(h) applied to a carryover that the taxpayer claimed on a return filed after PPA's effective date even though the carryover related to a deduction that arose on a return that the taxpayer filed before that date. However, Chandler did not decide whether the pre- or post-PPA rules apply with respect to the determination of whether a substantial or gross valuation misstatement penalty applies in the case of a post-PPA carryover that arose from a deduction claimed on a return before PPA's

(continued...)

[*60] PPA sec. 1219(a)(1)(A), (e)(1), 120 Stat. at 1083, 1085.  In the case of an individual the substantial valuation misstatement penalty applies only where the portion of the underpayment for the taxable year attributable to the substantial valuation misstatement exceeds $5,000.  See sec. 6662(e)(2).

Generally, the accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that there was reasonable cause and that he or she acted in good faith.  See sec. 6664(c)(1).  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Id.

---

[23](...continued)
effective date.  Cf. sec. 1.6662-5(c), Income Tax Regs. (providing that the substantial or gross valuation misstatement penalty applies with respect to a carryover if there is an underpayment for the carryover year and the valuation misstatement was substantial or gross in the year in which the valuation misstatement arises).  Because petitioners will not be liable for a substantial valuation misstatement penalty regardless of whether the pre- or post-PPA rules apply with respect to petitioners' 2006 carryover, see infra part IX.C.1, we do not decide this issue in this case.

**[\*61]** In the case of a substantial valuation misstatement with respect to charitable deduction property,[24] however, the reasonable-cause-and-good-faith defense does not apply unless the taxpayer can show that (1) "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser", sec. 6664(c)(2)(A); and (2) "in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property", sec. 6664(c)(2)(B).

C.     Whether Petitioners Are Liable for a Section 6662(a) Penalty

Because the reasonable cause defense for a substantial valuation misstatement penalty has more requirements than a reasonable cause defense for a substantial understatement of income tax penalty, we first consider whether petitioners are liable for a substantial valuation misstatement penalty.

1.     Substantial Valuation Misstatement Penalty

On their 2003 return petitioners claimed a $1.6 million charitable contribution deduction for Mr. Schmidt's donation of a conservation easement on the subject property to El Paso County.  A portion of that deduction was carried

---

[24]Charitable deduction property "means any property contributed by the taxpayer in a contribution for which a deduction was claimed under section 170." Sec. 6664(c)(3)(A).

[*62] over to each of petitioners' 2004, 2005, and 2006 returns.[25] We have

concluded that the value of the conservation easement, and the amount of the

resulting deduction, was $1,152,445. See supra part VIII. The amount petitioners

claimed on their 2003 return is less than 200% (and less than 150%) of the amount

we determined to be the correct amount. Accordingly, petitioners are not liable for

a penalty for a substantial valuation misstatement pursuant to section 6662(a) and

(b)(3) for any of the years at issue. See sec. 6662(e)(1)(A).

2.     Substantial Understatement Penalty

We shall assume for purposes of this analysis that petitioners understated

their Federal income tax liability by an amount exceeding the greater of at least

10% of the amount required to be shown on their return for at least one of the

taxable years at issue or $5,000, see sec. 6662(d)(1)(A), and consider whether

---

[25]With respect to carryovers, section 1.6662-5(c), Income Tax Regs., provides that

> [t]he penalty for a substantial or gross valuation misstatement applies to any portion of an underpayment for a year to which a loss, deduction or credit is carried that is attributable to a substantial or gross valuation misstatement for the year in which the carryback or carryover of the loss, deduction or credit arises (the "loss or credit year"), provided that the applicable dollar limitation set forth in section 6662(e)(2) is satisfied in the carryback or carryover year.

**[\*63]** petitioners had reasonable cause for the understatement and whether they acted in good faith, <u>see</u> sec. 6664(c)(1).  We conclude that they did.

In claiming a charitable contribution deduction for the conservation easement at issue, petitioners relied on Mr. Park's 2003 appraisal.  Mr. Park had the requisite credentials and experience to justify petitioners' reliance on the 2003 appraisal, and respondent concedes that it was a qualified appraisal.  Although we have sustained in part respondent's deficiency determination, we have done so because we did not find Mr. Park's report to be complete and convincing in certain respects.  However, we do not think that the problems that we found with Mr. Park's report, and by extension with the 2003 appraisal, call into question the reasonableness of petitioners' reliance on the 2003 appraisal.

Respondent contends that there are certain facts that support an inference that Mr. Park intended to secure excessive tax benefits for petitioners with his 2003 appraisal.  However, many of these facts are ambiguous and are also consistent with a good-faith attempt on the part of petitioners to reach the right result.  For example, we found that Mr. Park's reliance on dissimilar comparables undermined the reliability of his finished lot sales analysis.  <u>See</u> <u>supra</u> part VI.B.2.c.  However, it is possible that Mr. Park--and petitioners--reasonably

[*64] believed that the analysis was accurate and reliable.[26] Similarly, Mr. Park's handwritten notes contained a finished lot sale price that was significantly below the price that he used in the 2003 appraisal. However, the notes are undated and it is possible that the finished lot sale price estimate in Mr. Park's handwritten notes was a preliminary, uninformed guess. See supra part IV.

Respondent points to other facts, and inferences that he would like to draw from those facts, in support of his argument that Mr. Schmidt lacked good faith in accepting Mr. Park's 2003 appraisal, but we are unpersuaded. For example, respondent contends that Mr. Schmidt acquired the option to purchase the adjacent property only for the purpose of including the pending preliminary plan and zone change applications in Mr. Park's appraisal of the subject property. Respondent, however, does not explain why this is inconsistent with a good-faith attempt on the part of petitioners to achieve the right result. Similarly, respondent contends that Mr. Schmidt's decision not to purchase and develop the adjacent property shows that he did not believe that the 2003 appraisal was accurate or correct. We reject respondent's argument because the record shows that the adjacent property

---

[26]We note that Mr. Jones' November 2, 2001, cost estimate--which was not prepared in anticipation of Mr. Schmidt's granting of the conservation easement-- assumed average finished lot sale prices of $250,000 for the lots on the subject property. After adjusting for market conditions, this is close to the average finished lot sale price that Mr. Park determined in the 2003 appraisal.

**[*65]** was more difficult to develop than the subject property and Mr. Schmidt had other businesses to manage.

Because the record establishes--without regard to the burden of proof--that petitioners had reasonable cause for the underpayment and acted in good faith, we hold that petitioners are not liable for a penalty for a substantial understatement of Federal income tax pursuant to section 6662(a) and (b)(2). See sec. 6664(c)(1).

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.